STEVEN T. GUBNER - Bar No. 156593
SUSAN K. SEFLIN - Bar No. 213865
JERROLD L. BREGMAN - Bar No. 149896
EZRA BRUTZKUS GUBNER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email:    sgubner@ebg-law.com
          sseflin@ebg-law.com
          jbregman@ebg-law.com

Proposed Attorneys for Chapter 11 Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Case No. 1:15-bk-13952-MB |
| DIGITALSOUND PRODUCTION SERVICES, INC., | Chapter 11 |
| Debtor. | **DEBTOR'S NOTICE OF AND EMERGENCY MOTION FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH SALE OF THE DEBTOR'S ASSETS, (B) SCHEDULING HEARING TO CONSIDER THE SALE, AND (C) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER AUTHORIZING AND APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | **[LBR 9075-1; 11 U.S.C. §§ 105(a) 363, 365, 503 and 507; FRBP 2002, 6004, 6006, 9008, and 9014]** |
| | *Declaration of Charles G. Klaus Filed Concurrently Herewith* |
| | **Hearing:**<br>**Date:** December 2, 2015<br>**Time:** 3:30 p.m.<br>**Place:** Courtroom 303<br>      21041 Burbank Blvd.<br>      Woodland Hills, CA 91367 |

# TABLE OF CONTENTS

Page

I.    MEMORANDUM OF POINTS AND AUTHORITIES ....................................................5

II.   RELEVANT BACKGROUND ..........................................................................................5

    A.   General Case Background............................................................................................5

    B.   Description of the Debtor's Business. .......................................................................5

    C.   The Debtor's Capital Structure. .................................................................................5

    D.   The Debtor's Management and Filing to Effect Sale. .............................................6

III.  RELIEF REQUESTED.......................................................................................................9

IV.   BASIS FOR RELIEF .......................................................................................................11

    A.   Good Cause to Shorten Notice Periods....................................................................12

    B.   Stalking Horse Protections.......................................................................................15

    C.   Protections of Section 363(m) ..................................................................................17

    D.   The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Liens, Claims, Interests and Other Encumbrances ..................18

    E.   The Assumption and Assignment of Assumed And Assigned Contracts Should Be Authorized............................................................................................19

    F.   Waiver Of Bankruptcy Rules Regarding Stay Of Order .......................................22

    G.   Reservation of Rights................................................................................................22

V.    CONCLUSION.................................................................................................................22

i

# TABLE OF AUTHORITIES

*Page*

## CASES

Borman's, Inc. v. Allied Supermarkets, Inc.,
    706 F.2d 187, 189 (6th Cir. 1983), cert. denied, 464 U.S. 908 (1983) ...........................20

Comm. of Equity Security Holders v. Lionel Corp .(In re Lionel Corp.),
    722 F.2d 1063, 1070 (2d Cir. 1983) ...................................................................................12

EWI, Inc.,
    208 B.R. at 888 ...................................................................................................................16

Hargrave v. TU. of Pemberton (In re Tabone, Inc.),
    175 B.R. 855, 858 (Bankr. D.N.J. 1994) ...........................................................................21

In re 255 Park Plaza Assocs. Ltd. P'ship,
    100 F.3d 1214, 1218 (6th Cir. 1996) .................................................................................17

In re Bygaph, Inc.,
    56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) ....................................................................21

In re Delaware & Hudson Ry. Co.,
    124 B.R. 169, 176 (D. Del. 1991) ......................................................................................12

In re EWI, Inc.,
    208 B.R. 885, 888 (Bankr. N.D. Ohio 1997) .....................................................................15

In re HNRC Dissolution Co.,
    No. Civ. A. 04-158 HRW, 2005 WL 1972592, at *4 (E.D. Ky. 2005) ...........................17

In re Horizon Natural Resources Co.,
    No. 02-14621 [D.E. 3337] (Bankr. E.D. Ky. June 17, 2004) ...........................................15

In re Hupp Indus.,
    140 B.R. 191 (Bankr. N.D. Ohio 1992) .............................................................................15

In re Trans World Airlines, Inc.,
    No. 01-0056 (PJW), 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ..............18

Matter of Luce Indus., Inc.,
    8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980) ...........................................................................21

Mich. Employment Sec. Comm'n v. Wolverine Radio Co.,
    930 F.2d 1132, 1147 n.24 (6th Cir. 1991) .........................................................................18

Myers v. Martin (In re Martin),
    91 F.3d 389, 395 (3d Cir. 1996) .........................................................................................11

Pelican Homestead v. Wooten (In re Gabel),
     61 B.R. 661, 667 (Bankr. W.D. La. 1985) ........................................................................21

Stephens Indus., Inc. v. McClung,
    789 F.2d 386, 390 (6th Cir. 1986) ......................................................................................11

Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),
    75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) .............................................................19

## STATUTES

11 U.S.C. § 105(a) ...............................................................................................11

11 U.S.C. § 363(b)(1) ..........................................................................................11

11 U.S.C. § 363(f) ................................................................................................18

11 U.S.C. § 363(m) ..............................................................................................17

11 U.S.C. § 365(a) ...............................................................................................20

11 U.S.C. § 365(b)(1) ..........................................................................................20

11 U.S.C. § 365(c)(1)(B) ......................................................................................22

11 U.S.C. § 365(e)(2)(A)(ii) .................................................................................22

11 U.S.C. § 365(f) ................................................................................................22

11 U.S.C. § 365(f)(2) ...........................................................................................20

28 U.S.C. § 1334 ...................................................................................................5

28 U.S.C. § 1408 ...................................................................................................5

28 U.S.C. § 1409(a) ...............................................................................................5

28 U.S.C. § 157 .....................................................................................................5

28 U.S.C. § 157(b)(2) ............................................................................................5

Bankruptcy Code § 105(a) .............................................................................11, 19

Bankruptcy Code § 1107(a) ...................................................................................5

Bankruptcy Code § 1108 ........................................................................................5

Bankruptcy Code § 363 ..........................................................................................7

Bankruptcy Code § 363(b) ....................................................................................12

Bankruptcy Code § 363(b)(1) ...............................................................................11

Bankruptcy Code § 363(f) ...............................................................................18, 19

Bankruptcy Code § 363(f)(2) ................................................................................19

Bankruptcy Code § 363(f)(3) ................................................................................19

Bankruptcy Code § 363(m) ...................................................................................17

Bankruptcy Code § 365 ...........................................................................................................21, 22

Bankruptcy Code § 365(a) ...........................................................................................................20

Bankruptcy Code § 365(b)(1) .....................................................................................................20

Bankruptcy Code § 365(b)(1)(A).................................................................................................20

Bankruptcy Code § 365(b)(1)(C).................................................................................................21

Bankruptcy Code § 365(f)(2) ......................................................................................................19

## **RULES**

Bankruptcy Rule 6004(h)..............................................................................................................22

Bankruptcy Rule 6006(d)..............................................................................................................22

Bankruptcy Rule 9075-1(b) .........................................................................................................12

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE, SECURED LENDERS, CREDITORS HOLDING THE TWENTY LARGEST UNSECURED CLAIMS, AND THE OFFICE OF THE UNITED STATES TRUSTEE:**

**PLEASE TAKE NOTICE** that a hearing will be held on <u>**December 2, 2015 at 3:30 p.m.**</u> (prevailing Pacific time) before the Honorable Martin R. Barash, United States Bankruptcy Judge for the Central District of California, for the Court to consider the motion (the "Motion") filed by DigitalSound Production Services, Inc., the chapter 11 debtor and debtor in possession herein (the "Debtor"), for issuance of an order substantially in the form attached hereto as **Exhibit 1** (the "Bidding Procedures Order") (a) establishing bidding procedures (the "Bidding Procedures") for the sale of substantially all of the assets of the Debtor including scheduling an auction, (b) scheduling a hearing to consider such sale (the "Sale Hearing") and establishing deadlines related thereto (the "Sale Deadlines"), and (c) approving the form and manner of notice of such sale.  The Bidding Procedures are set forth in the form or order annexed hereto as **Exhibit 1**.

1.    By the Motion and to be heard at the Sale Hearing, the Debtor also requests the approval of an order authorizing and approving (i) any sale of the Acquired Assets (as defined below) through the process and procedures described herein, free and clear of all liens, claims, encumbrances and interests, other than those expressly assumed by the Stalking Horse Purchaser,[1] under Section 363 of the Bankruptcy Code and with the good faith protections of Section 363(m) of the Bankruptcy Code,  pursuant to a definitive and binding asset purchase agreement approved by this Bankruptcy Court, and (ii) the assumption and/or assignment of the Assigned Contracts (as defined below).

2.    The Motion is brought on an emergency basis so that it may be heard as soon as possible consistent with the Stalking Horse APA which, among other things, requires as a condition to the Stalking Horse Purchaser's obligation to close the transaction that the contemplated Sale Order be entered by the Bankruptcy Court by no later than the 31st day, and the exigent financial

---

[1] Capitalized terms that are not defined herein shall have the meanings ascribed to them in the accompanying Stalking Horse APA (as defined below) which is hereto attached as **Exhibit 2.**

circumstances compelling the Debtor to seek an earlier sale hearing date to allow the sale to close by December 31, 2015.

3.    Among other things, the Motion contemplates the sale of substantially all of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code, which sale is contemplated to close by the Target Closing Date of December 31, 2015. **The package of consideration the Debtor would receive from the contemplated sale is valued at $5,975,242**, inclusive of $4,095,000 of cash plus $1,880,242 of Assumed Obligations, **which is subject to overbid at an Auction,** as specified in that certain Asset Purchase Agreement, dated as of November 30, 2015 (and as may be amended, the "Stalking Horse APA"), which is attached hereto as **Exhibit 2**.[2]

4.    The parties in interest, including counsel for the Debtor, counsel for the Stalking Horse Purchaser, and counsel for the minority shareholder who is providing the necessary cash to fund the Debtor's operations as its DIP lender, have been working at arm's length, and in good faith, virtually around the clock for the past few weeks, including, nights, weekends, and holidays, to negotiate and document an agreement to achieve the contemplated asset sale subject to overbid, and run the sale process which the parties believe is open and fair and will maximize the value of the Debtor's estate. The terms and conditions of the Stalking Horse APA, including the breakup fee of $122,850, expense reimbursement of up to $75,000 (which together equal $197,850 which equals 3.3% of the purchase price), and minimum overbid price amount of $57,150, for a "Minimum Overbid Price of $6,230,242 (collectively, the "Stalking Horse Protections") in particular, were heavily negotiated and the resulting agreement, which consists of a bundle of inseparable and mutually dependent rights and obligations, were a material inducement to the Stalking Horse Purchaser agreeing to enter into the Stalking Horse APA, and are designed to maximize the value of the Debtor's estate by achieving the highest and best sales price for the Acquired Assets.

5.    The Stalking Horse APA was executed by and between the Debtor, as "Seller", and the Stalking Horse Purchaser, Atomic Lighting LLC (the "Stalking Horse Purchaser"), subject to this Court's approval and may be subject to further change in accordance with its terms.

---

[2] The Schedules and Exhibits to the Stalking Horse APA will be filed at a later date with this Court.

6.     It is contemplated that as of the hearing on this Motion, the Debtor will be holding the Stalking Horse Purchaser's $200,000 Deposit, on the terms specified in the Stalking Horse APA, to secure the Stalking Horse Purchaser's performance under the Stalking Horse APA.

7.     The Motion is supported by the Declaration of Charles G. Klaus filed in support of the Motion (the "Klaus Declaration").

8.     As evidenced by the Klaus Declaration and summarized below, the shortening of the various notice periods associated with the relief requested by this Motion is necessary and appropriate to avoid immediate and irreparable harm to the Debtor's estate to the detriment of creditors.

**PLEASE TAKE FURTHER NOTICE** that this Motion is based on the accompanying Memorandum of Points and Authorities, the Klaus Declaration, the arguments of counsel as may be presented at the hearing on the Motion, and any other admissible evidence brought before the Court in connection with the Motion.

**PLEASE TAKE FURTHER NOTICE** that any opposition or objection to the Motion may be raised at the hearing on this matter which is currently scheduled for hearing on December 2, 2015 at 3:30 p.m.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order, substantially in the form of the Proposed Order attached hereto as **Exhibit 1**, and set the following hearing date, deadlines, and Auction date:

a.  **Sale Hearing**:  Tuesday or Wednesday, **December 22 or 23, 2015**, at _____ _.m., as may please the Court, which is the most important of the requested dates to enable the parties a sufficient opportunity to close on Debtor's sale of the Acquired Assets by December 31, 2015, consistent with the necessities of the Debtor's circumstances, with the other dates requested below to be set with reference to the Sale Hearing date.

b.  **Bidding Deadline**:  [Friday, December 18, 2015], at 6:00 p.m. (prevailing Pacific time) as the deadline by which all binding bids must actually be received pursuant to the Bidding Procedures (the "Bidding Deadline").  Bidders must deliver the necessary bid documents required to participate in the Auction pursuant to the Bidding Procedures to (1) Charles Klaus at cklaus@sbcglobal.net, (2) Susan K. Seflin at sseflin@ebg-law.com, and (3) Jerrold L. Bregman at jbregman@egb-law.com.

c.  **Auction:** In the event at least one Qualified Bid (other than the Stalking Horse APA) is received: [Monday, December 21, 2015], commencing at 10:00 a.m. (prevailing Pacific time) as the date and time the Auction will commence at the offices of Ezra Brutzkus

Gubner LLP, 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367 (or at any such other location or time as the Debtor may hereafter designate in writing to the Qualified Bidders).

 d. **Sale Objection Deadline**: the deadline to object to the Sale transactions and/or the assumption and assignment of Assigned Contracts or cure amounts related thereto (to the extent a Cure Notice (as defined herein) has been filed with the Bankruptcy Court) shall be December [18], 2015 (the "Sale Objection Deadline"); and

 e. **Prompt Closing Absent Stay**. To implement the sale transactions within the expedited time frame required by the Debtor's circumstances, the Motion requests that if it is granted, the waiver of any stay arising under Bankruptcy Rules 6004(h) and 6006(d), or any similar rules.

DATED: November 30, 2015     EZRA BRUTZKUS GUBNER LLP


             By: /s/ Susan K. Seflin
              Susan K. Seflin
             Proposed Attorneys for Chapter 11 Debtor
             and Debtor in Possession

# I.    MEMORANDUM OF POINTS AND AUTHORITIES

## Jurisdiction and Venue

1.    This Bankruptcy Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.    This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

# II.    RELEVANT BACKGROUND

### A.    General Case Background.

4.    On November 30, 2015, DigitalSound Productions Services, Inc., a California corporation and the chapter 11 debtor and debtor in possession herein (the "Debtor"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in the Debtor's chapter 11 case.

### B.    Description of the Debtor's Business.

5.    Formed in 2006 as a California limited liability company and converted to a California corporation in 2011, the Debtor provides full-service entertainment production services with premium quality lighting, sound, video, staging equipment and/or other video and sound solutions for a wide variety of events and productions.  The Debtor primarily rents large-scale equipment to customers planning events in the following segments: cinema, concert and other tours, commercial, corporate and worship.  A portion of the Debtor's business involves the sale of incidentals and consumables that are required for the effective use of the rented equipment.  The Debtor also occasionally sells large equipment to customers.

6.    The Debtor's principal place of business is located at 12950 Pierce Street, Pacoima, California 91331.  The Debtor's website is www.dpsinc.com.

### C.    The Debtor's Capital Structure.

7.    While the Debtor was converted from a California limited liability company to a California corporation in 2011, the Debtor has not historically followed corporate formalities.  While

it appears that Anthony Dever ("Dever") is the fifty-one percent (51%) shareholder and Alex Alvord

("Alvord") is the forty-nine percent (49%) shareholder, the Debtor's books and records contain

signed stock certificates for only Alvord's shares.  The Debtor does not have any subsidiaries or own

any substantial stock in any other companies.

**D.**      **The Debtor's Management and Filing to Effect Sale.**

8.      Dever originally founded the Debtor as a limited liability company in 2006 and was

its sole member and shareholder until approximately 2011.  In 2011, Dever converted the Debtor to a

California corporation in order to facilitate an equity investment in the Debtor by Alvord.  In 2011,

Alvord made his initial equity investments in the Debtor in the amount of approximately $4.1

million, and acquired his forty-nine percent (49%) ownership interest at that time.  No other transfers

of the Debtor's stock are reflected in the Debtor's books and records.

9.      Since its conversion to a corporation in 2011, the Debtor's operations have been

funded by Alvord, but the company has been operating at a loss since then.  For example, the

average monthly burn rate (expenses above operating income) was approximately $592,000 (per

month) for the first nine months of 2015.  Since then, the Debtor has taken drastic measures,

including three rounds of employee terminations and a termination of its lease in its former location

in Burbank, California, which have resulted in a reduced burn rate of approximately $400,000 per

month.

10.      Presently, the Debtor employs about 30 people, including 28 full-time employees and

two independent contractors.  In addition, presently the Debtor has ten freelance employees who

assist the Debtor on a project by project basis.  The number of freelancers the Debtor employees

varies greatly on a month to month basis.

11.      In June 2015, a dispute arose between Alvord and Dever resulting in the filing of a

lawsuit by Alvord filed against the Debtor and Dever in Superior Court, Orange County (Case No.

30-2015-00801037).  Pursuant to a stipulated order entered on September 2, 2015, the parties agreed

to the terms set forth in a Term Sheet entered into by the parties on July 30, 2015 (the "Term

Sheet").  Pursuant to the Term Sheet, Dever resigned from all of his positions with the Debtor.  Prior

to that, Dever served as the sole director and as the Chief Executive Officer, Secretary and Chief

Financial Officer of the Debtor, according to the Statements of Information the Debtor filed with the California Secretary of State on January 23, 2014 and February 3, 2015.

12.     As set forth in the Term Sheet and as consented to by both shareholders, Charles G. Klaus ("Klaus") was appointed as a provisional director and responsible officer for the Debtor, and he has served as the sole director and Chief Executive Officer of the company since then.  All business and operations decisions have been made from the time of his appointment until now by Klaus, in consultation with the Debtor's corporate counsel, Encore Law Group, that was engaged in April 2015.

13.     Lacking the financial means to continue to operate its business with operating deficits, and in light of its perceived future business prospects, the Debtor evaluated strategies to maximize the value of its enterprise for the benefit of creditors.  In consultation with the Debtor's management and advisors, Klaus determined in the exercise of his business judgment that the optimal route to maximize the value of the Debtor's enterprise for the benefit of creditors was to sell substantially all of the Debtors assets as a going concern.  To that end, the Debtor shopped itself and learned that, in light of the litigation between the owners of this closely held company, and other factors, a free and clear sale under section 363 of the Bankruptcy Code was necessary to provide any prospect of repaying the Debtor's creditors close to in full.

14.     The Debtor's marketing process pre-petition led to its agreement with the Stalking Horse Purchaser to buy substantially all of the Debtor's assets, subject to higher and better offers at auction under the auspices of the Bankruptcy Court.  This agreement is reflected in the Stalking Horse APA.  The prospective transaction contemplates a purchase price of approximately $6 million, inclusive of approximately $4 million of cash plus the assumption of more than $1.8 million of the Debtor's obligations, and is subject to overbid and increase in the event of an Auction subject to the receipt of one or more Qualifying Bid.

15.     If implemented as envisioned, the Debtor is optimistic that the proceeds of the contemplated sale, after anticipated costs, is likely to yield sufficient proceeds to enable the Debtor to satisfy all of its debts in full.  Thereafter, there would be no benefit from remaining in bankruptcy and a structured dismissal would be sought at that time.  Moreover, a going-concern sale as the

1   Debtor contemplates will enhance the prospects of future employment opportunities for many if not

2   all of the Debtor's employees.

3   <u>**Summary of the Principal Terms of the Stalking Horse APA**</u>[3]

4   16.    The Acquired Assets that are to be acquired pursuant to the Stalking Horse APA

5   consist of substantially all of the Debtor's assets, exclusive of certain assets, including, without

6   limitation, the Debtor's cash.  For the avoidance of doubt, the Stalking Horse Purchaser would not

7   be acquiring any of the Debtor's causes of action arising under Chapter 5 of the Bankruptcy Code;

8   however, the Stalking Horse APA provides for the wavier of any Chapter 5 causes of action

9   "relating to the Business and Acquired Assets" which includes any actions against or involving any

10  counterparty to any of the Assigned Contracts, employees the purchaser hires, vendors and trade

11  creditors that do business with the purchaser within 90 days after Closing.  The Acquired Assets also

12  include the assumption of the Debtor's rights and obligations with respect to the Assigned Contracts,

13  namely, certain executory contracts and unexpired leases that are to be assumed and assigned to the

14  Stalking Horse Purchaser as of the closing, and which are identified in the Stalking Horse APA.

15  17.    The contemplated sale of the Acquired Assets is to be "free and clear" of all claims

16  and interests except as specified in the Stalking Horse APA, pursuant to Section 363 of the

17  Bankruptcy Code.  Stalking Horse Purchaser's right to purchase the Acquired Assets is subject to

18  overbid at Auction in the event one or more Qualified Bids is received by the Bidding Deadline.

19  Any Auction would be conducted in accordance with Bidding Procedures Order, inclusive of the

20  Stalking Horse Protections which the Debtor has determined are reasonable and appropriate under

21  the circumstances, and which have been negotiated at arm's length and in good faith.

22  18.    The Stalking Horse APA contemplates that as of the consummation of the Closing on

23  the Closing Date, and except as specified in the Stalking Horse APA or otherwise agreed by the

24  Debtor, the employment of substantially all of the Debtor's employees will be terminated by the

25  Debtor but some of whom are to be hired by the Purchaser.  After the Closing, the Stalking Horse

26

27

28  [3] The summary provided for the reader's ease or reference; however, in the event of any ambiguity or
inconsistency of terms between this summary and the Stalking Horse APA, the Stalking Horse APA shall
control.

Purchaser will hire certain employees pursuant to new employment agreements except for those employees to be hired with whom the Debtor has an employment contract which contracts will be among the Assigned Contracts. Notwithstanding the foregoing, with respect to any employee who is not to be hired by Stalking Horse Purchaser, Seller may continue to employ such employee after the Closing. With respect to any employee who is hired by Stalking Horse Purchaser, Stalking Horse Purchaser at its cost shall make such Employees available to perform for Seller any necessary functions associated with the employment contract for such Employee through the end of the term of such contract.

## III.    **RELIEF REQUESTED**

19.    As contemplated by the Stalking Horse APA, the Debtor intends to complete the sale of substantially all of its assets in a sale transaction to close by December 31, 2015. To facilitate this sales process, the Debtor seeks entry of two orders as follows:

20.    First, the Debtor seeks approval of a Bidding Procedures Order, substantially in the form set forth in the proposed Bidding Procedures Order hereto attached as **Exhibit 1**:

  a.    approving bidding and auction procedures (the "Bidding Procedures") in connection with the receipt, analysis and improvement of bids for the sale of all or any of the Debtor's assets free and clear of all liens, claims interests and other encumbrances, except as otherwise to be provided in the Sale Order (as defined below);

  b.    authorizing the Debtor's inclusion in the Bidding Procedures those certain Stalking Horse Protections specified in the Stalking Horse APA for the benefit of the Stalking Horse Purchaser, which consist of certain customary bid protections in connection with a sale transaction, including a breakup fee plus expense reimbursement up to $197,850, which is approximately 3.3% of the Purchase Price valued at $5,975,242, thus, together with the initial overbid amount of $57,150, equals the "Minimum Overbid Price" of $6,230,242 specified in the proposed Bidding Procedures;

  c.    scheduling a hearing (the "Sale Hearing") to consider entry of the Sale Order (as defined below) to take place on or before December 30, 2015 (prevailing Pacific time), subject to the Bankruptcy Court's availability, with any objections to the sale of the Acquired Assets to be filed on or before 4:00 p.m. (prevailing Pacific time) at least ten (10) days before the Sale Hearing;

  d.    approving procedures, as set forth below, and set forth more fully in the proposed Bidding Procedures Order, for the assumption and assignment of the Assigned Contracts and/or to resolve any objections thereto; and

e.      approving the form and manner of notice of (i) the auction (the "Auction") for the Acquired Assets and the Sale Hearing, substantially in the form attached hereto as Exhibit 3 (the "Sale Notice"); and (ii) the notice of the Debtor's intent to assume, assign and assign the Assigned Contracts, and the corresponding cure amounts required to be paid in connection with such assumption, assignment and/or transfer (the "Cure Notice"), substantially in the form attached hereto as **Exhibit 4.**

21.      The Debtor expressly reserves the right to modify the relief requested in this Motion before or at the applicable hearings, including modifying the proposed Bidding Procedures in its reasonable discretion not inconsistent with the Stalking Horse APA, in any manner that will best promote the goals of the bidding process and maximizing the value of the Debtor's assets, consistent with the provisions of the Stalking Horse APA, inclusive of the Stalking Horse Protections.

22.      In connection with the above-requested relief, the Debtor requests that the Bankruptcy Court establish the following dates and deadlines, subject to modification:

a.      **Sale Hearing**: Tuesday or Wednesday, **December 22 or 23, 2015**, at _____ _.m., as may please the Court, with the other dates requested below to be set with reference to the Sale Hearing date.

b.      **Bidding Deadline**: [Friday, December 18, 2015], at 6:00 p.m. (prevailing Pacific time) as the deadline by which all binding bids must actually be received pursuant to the Bidding Procedures (the "Bidding Deadline"). Bidders must deliver the necessary bid documents required to participate in the Auction pursuant to the Bidding Procedures to (1) Charles Klaus at cklaus@sbcglobal.net, (2) Susan K. Seflin at sseflin@ebg-law.com, and (3) Jerrold L. Bregman at jbregman@egb-law.com.

c.      **Auction** in the event at least one Qualified Bid (other than the Stalking Horse APA) is received: [Monday, December 21, 2015], commencing at 10:00 a.m. (prevailing Pacific time) as the date and time the Auction will commence at the offices of Ezra Brutzkus Gubner LLP, 21650 Oxnard Street, Suite 500, Woodland Hills, CA  91367 (or at any such other location or time as the Debtor may hereafter designate in writing to the Qualified Bidders).

d.      **Sale Objection Deadline**: the deadline to object to the Sale transactions and/or the assumption and assignment of Assigned Contracts or cure amounts related thereto (to the extent a Cure Notice (as defined herein) has been filed with the Bankruptcy Court) shall be December [18], 2015 (the "Sale Objection Deadline"); and

e.      **Prompt Closing Absent Stay**. To implement the sale transactions within the expedited time frame required by the Debtor's circumstances, the Motion

10

requests that if it is granted, the waiver of any stay arising under Bankruptcy Rules 6004(h) and 6006(d), or any similar rules.

23.     Second, following the Auction and the Sale Hearing, the Debtor requests entry of an order (the "Sale Order"), substantially in the form to be filed with the Bankruptcy Court before the Sale Hearing, authorizing and approving (a) the sale of the Acquired Assets free and clear of liens, claims, interests and other encumbrances pursuant to the Stalking Horse APA or other Successful Bid, as the terms of its consideration may have been improved at the Auction for the benefit of the Debtor's estate, with the bidder selected by the Debtor, in consultation with the Committee, if any, as submitting the highest or otherwise best offer(s) at the Auction, and (b) assumption and assignment of the Assigned Contracts in connection therewith.

24.     The Debtor submits that the Bidding Procedures, set forth in the accompanying proposed Bidding Procedures Order, provide an appropriate framework for selling the Acquired Assets and will enable the Debtor to review, analyze and compare all bids received to determine which bid or bids is or are in the best interests of the Debtor's estates.  Importantly, the Bidding Procedures recognize the Debtor's fiduciary obligations to maximize sale value, and, as such, do not impair the Debtor's ability to consider all qualified bid proposals.

## IV.     BASIS FOR RELIEF

25.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

26.     The Debtor's sale or use of property of the estate outside the ordinary course of business should be approved by the Bankruptcy Court if the Debtor can demonstrate a sound business justification for the proposed transaction.  *See, e.g., Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *see also Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1990)); *Comm. of Equity Security Holders v. Lionel Corp .(In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir.

1983); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (explaining that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to Section 363(b) of the Bankruptcy Code).

27.     There is more than adequate business justification to sell the Acquired Assets to the Stalking Horse Purchaser subject to overbid at the Auction.  The Debtor's management and advisors have concluded that this asset sale, if achievable, will preserve the substantial goodwill of the Debtor's assets and avoid a liquidation sale or sales at depressed prices.

28.     Furthermore, the Stalking Horse Purchaser's Stalking Horse APA is subject to competing bids at the Auction, provided that there are other Qualified Bids received by the Bidding Deadline, thereby enhancing the Debtor's ability to receive the highest and best value for its assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtor ultimately will be demonstrated by a "market check" through an auction process, which is the best means for establishing that a fair and reasonable price is being paid.

29.     Finally, all creditors and parties in interest will receive adequate notice of the Bidding Procedures, the Auction and the Sale Hearing as provided herein.  Such notice is reasonably calculated to provide timely and adequate notice to the Debtor's major creditor constituencies, those parties most interested in this Chapter 11 Case, those parties potentially interested in bidding on the Acquired Assets and others whose interests are potentially implicated by the proposed sale.  The Debtor submits that such notice is sufficient for entry of the Sale Order and satisfies requisite notice conditions for approval of the sale under Section 363(b) of the Bankruptcy Code.

30.     Under these circumstances, the Debtor submits that sound business reasons exist for the proposed sale of the Acquired Assets outside the ordinary course of business and before the confirmation of a Chapter 11 plan pursuant to the Bidding Procedures.

**A.     Good Cause to Shorten Notice Periods**

31.     Local Bankruptcy 9075-1(b) provides for the shortening of notice periods for "good cause."  Approval of the sale process contemplated hereby, including the shortening of notice periods for the bidding procedures and sale contemplated hereby, is necessary to avoid immediate and irreparable harm to the Debtor and its estate.  Most importantly, among other reasons, the sale

procedures the Debtor proposes by the Motion provide the necessary bridge to the contemplated sale of assets that is expected to maximize the value of the Debtor's assets and provide the Debtor with net proceeds sufficient to satisfy creditors' claims in full.  The Debtor subsequently plans to promptly seek the structured dismissal of this bankruptcy case after submitting evidence of the closing of the contemplated sale transactions and availability of funds on hand that are expected to be sufficient to satisfy creditors' claims in full.

32.    Absent the requested relief, and shortened notice periods to avoid substantial costs and delays, the Debtor has no assurance of obtaining the financing it needs to remain in business to maximize the value of its assets for the benefit of creditors, which financing is to be provided by the minority shareholder who is also the DIP lender ("Insider DIP") who has expressed willingness to fund the sale process contemplated by the Motion on the financial terms for which the Debtor is requesting approval by separate motion concerning debtor-in-possession funding.  Such financing is necessary because the Debtor is losing at least $100,000 *per week* from its operations, and more during the winter months when bookings are down and accounts receivable fall, as the Debtor currently is experiencing.  It is necessary that the Debtor remain in business to maximize the sales price for the Acquired Assets as opposed to a liquidation valuation that would be expected otherwise, which is materially less than the consideration to be provided under the Stalking Horse APA.  The month of December includes three payroll periods, and each payroll is substantial, which will constrain and deplete the Debtor's available cash.  Thus, the sales process, with a target closing date of no later than December 31, 2015, is designed to be expeditious consistent with the Debtor's available cash resources, including funding from the Insider DIP.

33.    Moreover, the Debtor's employee ranks are being decimated as employees depart for more certain opportunities, which threatens the Debtor's continued ability to receive a sales price consistent with the going-concern value for the Acquired Assets rather than liquidation value.

34.    The requested shortening of notice periods also is in recognition of the Debtor's pre-petition marketing efforts to sell the Acquired Assets on the highest and best terms.  The Debtor's vigorous and robust activities in this regard were focused largely on industry participants, including strategic and financial investors, within the Debtor's relatively small business segment, where news

of the Debtor's sales process has been spread widely to potential bidders.  Specifically, among other things, the Debtor retained Tom Sorce, a 30-year industry veteran, to act as a business broker on a consultancy basis to help facilitate the sale of DPS's assets, on terms including $500 per week plus a commission equal to 1.5% of the value to be received upon the closing of a sale, plus an advertising agency, SRI Advertising, to assist the Debtor in placing media advertising and purchasing the mailing list of companies in the same industry as DPS for targeted marketing initiatives.  These marketing efforts included sending approximately 19,000 emails to industry participants on September 8, 2015, an additional approximately 56,500 emails on September 15, 2015, and an additional approximately 13,000 emails to industry participants on September 22, 2015.  The Debtor also mailed solicitations of interest postcards to more than 5,000 participants in the motion and video production industry, and built and populated a secure online data room containing key documents and financial information about the Debtor and the Acquired Assets ("Data Room") to facilitate the due diligence by interested parties.  This process resulted in approximately 22 parties requesting information and being sent a non-disclosure agreement ("NDA") of whom approximately nine (9) executed and returned the NDA and were granted access to the Data Room.  Of these, the Debtor received two non-binding offers in the form of letters of interest which the Debtor negotiated, one of which was from the Stalking Horse Purchaser and led to the Stalking Horse APA, plus the Debtor has received two additional expressions of interest from potential bidders who have expressed interest in possibly participating in an Auction.

35.    Accordingly, the Debtor's fulsome prepetition sales process included substantial negotiations with several different prospective purchasers, resulting ultimately in the negotiation of and entry into the Stalking Horse APA.  Significantly, the Stalking Horse APA preserves the opportunity for other potential bidders, many of whom are already aware of the Debtor's proposed sales process, to make an overbid to purchase the Acquired Assets on higher and better terms than those specified in the Stalking Horse APA. If the requested notice periods were not shortened, the Debtor's ability to effect a sale of the Acquired Assets in a transaction likely to maximize their value, and yield sufficient net proceeds to satisfy in full the claims against the Debtor's estate, would be materially and adversely affected, and irreparably harmed.

### B.    Stalking Horse Protections

36.    The ability of the Debtor to offer the Stalking Horse Protections to the Stalking Horse Purchaser is beneficial to the Debtor's estate and creditors because doing so will provide the incentive required to induce the Stalking Horse Purchaser to submit or increase its bid before the Auction.  To the extent bids can be improved before the Auction, a higher floor is established for further bidding.

37.    Moreover, bid incentives such as the Stalking Horse Protections provide material encouragement to encourage a potential Stalking Horse Purchaser to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the Chapter 11 process, including in particular the risk of an overbid after the terms of the Stalking Horse APA are made known.  Providing reasonable bid protections is customary to compensate a bidder for costs, including lost opportunity costs, incurred as a result of its willingness to enter into an asset purchase agreement and accept the role as the "stalking horse" bidder.  *See In re Horizon Natural Resources Co.*, No. 02-14621 [D.E. 3337] (Bankr. E.D. Ky. June 17, 2004); *In re EWI, Inc.*, 208 B.R. 885, 888 (Bankr. N.D. Ohio 1997) (noting the customary nature of break-up fees).

38.    In *In re Hupp Indus.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992), the court identified seven factors that it considered in determining whether certain bid protections, including a break-up fee, were appropriate: (a) whether the fee requested correlates with a maximization of value to the debtor's estate; (b) whether the underlying negotiated agreement is an arm's-length transaction between the debtor and the acquirer; (c) whether the principal secured creditors and the official creditors' committee(s) are supportive of the requested fee; (d) whether the proposed break-up fee constitutes a fair and reasonable percentage of the proposed purchase price; (e) whether the dollar amount of the break-up fee is so substantial that it imposes a "chilling effect" on other potential bidders; (f) the availability of safeguards to protect the debtor's estate; and (g) if unsecured creditors oppose the break-up fee, whether there is a substantial adverse impact upon such creditors.  *Id.* at 194.

39.     The Debtor submits that the Stalking Horse Protections are appropriate under the circumstances.  First, the Stalking Horse Protections enable the Debtor to ensure the sale of the Acquired Assets to a contractually-committed bidder at a price the Debtor believe to be fair while, at the same time, providing the Debtor with the potential of an even greater return to this estate.  Thus, if the Stalking Horse Protections offered to the Stalking Horse Purchaser are approved and ultimately the Stalking Horse Purchaser is not the Successful Bidder, the Debtor and its estate will have benefited from the higher floor established by the Stalking Horse APA.

40.     Second, the Stalking Horse APA was an arm's-length negotiation between the Stalking Horse Purchaser and the Debtor who were counseled by sophisticated advisors during the negotiation process.

41.     Third, the Debtor, after having worked with their legal and financial advisors to fashion the Stalking Horse Protections, have also consulted with their principal secured lender who is also the minority shareholder, who supports the Stalking Horse Protections.

42.     Fourth, the proposed Breakup fee is not excessive and represents approximately 3% of the minimum Purchase Price established by the Stalking Horse APA.  *See EWI, Inc.,* 208 B.R. at 888 (authorizing 3.6% break-up fee).

43.     Fifth, the Breakup Fee and the minimum overbid increment do not present a barrier to, or otherwise meaningfully discourage, participation in the Auction process, given the relatively low amount relative to the value of the Acquired Assets, as valued in the Stalking Horse APA.

44.     Sixth, there exists a safeguard beneficial to the Debtor's estate in that the only way the Breakup Fee is ever paid is if a bidder other than the Stalking Horse Purchaser purchases the Acquired Assets at the Auction on better terms than the Stalking Horse APA.

45.     Finally, the Debtor has exercised prudent business judgment before offering or agreeing to any of the Stalking Horse Protections and has done so after concluding that such protections will likely result in the realization of greater value for the Debtor and its estate than without such Stalking Horse Protections.  Therefore, the Stalking Horse Protections do not have a substantial adverse impact upon such the Auction Process and are designed to maximize the value of the Debtor's assets.

46.     Accordingly, the Debtor submits that, in the exercise of its business judgment, the Stalking Horse Protections are reasonable and appropriate and represent the best method for maximizing the value of the Debtor's assets for the benefit of the Debtor's creditors, and therefore should be approved.

**C.     Protections of Section 363(m)**

47.     The Debtor and the Stalking Horse Purchaser have negotiated the Stalking Horse APA at arm's length and in good faith.  Accordingly, the Debtor believes that the Stalking Horse Purchaser, and any Successful Bidder, should be entitled to the protections of Section 363(m) of the Bankruptcy Code.  Accordingly, the Debtor requests that the Bankruptcy Court make a finding at the Sale Hearing that the Stalking Horse APA's, including any Stalking Horse APA if the Stalking Horse Purchaser is the Successful Bidder, were negotiated at arm's length and are entitled to the protections of Section 363(m) of the Bankruptcy Code.

48.     Section 363(m) of the Bankruptcy Code provides, in relevant part, that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . .

11 U.S.C. § 363(m).

49.     Although the Bankruptcy Code does not define "good faith Stalking Horse Purchaser," courts construing Section 363(m) have adopted the traditional equitable definition of a "good faith Stalking Horse Purchaser" and therefore, "to be covered under the statutory protection of § 363(m), the buyers must have purchased the property 'in good faith' and 'for value.'"  *In re HNRC Dissolution Co*., No. Civ. A. 04-158 HRW, 2005 WL 1972592, at *4 (E.D. Ky. 2005) (citing *In re Abbotts Dairies of Pennsylvania, Inc*., 788 F.2d 143, 147 (3d Cir. 1986)).  To constitute lack of good faith, a court must find "fraud or collusion between the Stalking Horse Purchaser and the seller or the other bidders, or that the Stalking Horse Purchaser's actions constituted an attempt to take grossly unfair advantage of other bidders."  *In re 255 Park Plaza Assocs. Ltd. P'ship*, 100 F.3d 1214, 1218 (6th Cir. 1996).

17

**D.    The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Liens, Claims, Interests and Other Encumbrances**

50.    Under Section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any interest in such property of an entity other than the estate only if, among other things:

a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.    such entity consents;

c.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.    such interest is in bona fide dispute; or

e.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

51.    Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of liens and interests. *See Mich. Employment Sec. Comm'n v. Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (Section 363(f) is written in the disjunctive and a court may approve a sale "free and clear" provided at least one of the subsections of Section 363(f) of the Bankruptcy Code is met).

52.    In addition, the Debtor submits that the Acquired Assets may be sold free and clear of claims, including successor liability claims, as no Successful Bidder will, as a result of any action taken in connection with the purchase of the Acquired Assets:  (a) be a successor to the Debtor; (b) have, *de facto* or otherwise, merged with or into the Debtor; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor.

53.    Several courts have held that, notwithstanding the use of the term "interest" in the statutory language of Section 363(f) of the Bankruptcy Code, that section grants bankruptcy courts the power to convey assets free and clear of claims. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of

1   debtor's assets] free and clear of . . . successor liability claims achieves the purpose of [Bankruptcy

2   Code] section 363 intended by Congress.").  Other courts, concluding that Section 363(f) of the

3   Bankruptcy Code does not empower them to convey assets free and clear of claims, have

4   nevertheless found that Section 105(a) of the Bankruptcy Code provides such authority.  *See Volvo*

5   *White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944,

6   948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and

7   clear of claims poses no impediment to such a sale, as such authority is implicit in the court's

8   equitable powers when necessary to carry out the provisions of Title 11).

9       54.    The Debtor submit that one or more of the subsections of Section 363(f) of the

10  Bankruptcy Code applies to each of the holders of liens, claims, interests or encumbrances in or

11  against the Acquired Assets.  Such holders will be adequately protected because their liens, claims

12  and/or interests are contemplated to be assumed by the Stalking Horse Purchaser to the extent the

13  assets that are collateral therefor are included among the Acquired Assets or their claims, to the

14  extent of their liens, would attach to the net proceeds of the sale.  The Debtor would be responsible

15  for paying all Cure Amounts.  In particular, the Debtor believes that to the extent parties holding

16  liens, claims or other interests do not consent to the sale pursuant to Section 363(f)(2) of the

17  Bankruptcy Code, that the sale proceeds will be greater than the aggregate value of all such liens,

18  claims or interests, such that Section 363(f)(3) is satisfied.  Moreover, the DIP Lender, who hold

19  liens on the Acquired Assets and is the minority shareholders, had indicated to the Debtor that it

20  consents to the sale of such assets.  Accordingly, the sale should be approved under Section 363(f) of

21  the Bankruptcy Code.

22      **E.    The Assumption and Assignment of Assumed And Assigned Contracts Should**

23          **Be Authorized**

24      55.    Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

25      The trustee may assign an executory contract or unexpired lease of the
            debtor only if-

26

27      (A)    the trustee assumes such contract or lease in accordance with the
                provisions of this section; and

28

(B)   adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

56.   Under Section 365(a) of the Bankruptcy Code, a trustee, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Courts routinely approve motions to assume and assign, or reject, executory contracts or unexpired leases upon a showing that a debtor's decision to take such an action will benefit the debtor's estate and is an exercise of the debtor's sound business judgment.  *See, e.g., Borman's, Inc. v. Allied Supermarkets, Inc.*, 706 F.2d 187, 189 (6th Cir. 1983), cert. denied, 464 U.S. 908 (1983).

57.   Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  This subsection provides:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee

(A)   cures, or provides adequate assurance that the trustee will promptly cure, such default . . .;

(B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)   provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

58.   The Debtor submits that the statutory requirements of Section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because any Stalking Horse APA will require that the Successful Bidder promptly cure all defaults associated with, or required to properly assume, the Assigned Contracts.  Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtor is confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

59.     Similarly, the Debtor submits that the third requirement of Section 365(b)(1)(C) of the Bankruptcy Code – adequate assurance of future performance – is also satisfied given the facts and circumstances present here.  Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.  *Matter of Luce Indus., In*c., 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources to perform and has expressed a willingness to devote sufficient funding to its business to do so).

60.     The Debtor believes that it can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to any Successful Bidder will be satisfied at the Sale Hearing.  The Stalking Horse APA places the responsibility for making such showing upon the Stalking Horse Purchaser.  Further, all counterparties will be provided with notice of the proposed assumption and assignment of the Assigned Contracts and will have adequate time and opportunity to object to the assumption or proposed cure amount or otherwise to be heard with respect thereto.

61.     Finally, the Debtor requests that any counterparty under an Assumed Contract that fails to object to the proposed transactions by the Sale Objection Deadline (or such later deadline as may be applicable for any post-closing designation of Assigned Contracts) shall be deemed to have consented to the treatment of its Contract or Lease under Section 365 of the Bankruptcy Code (including the proposed cure amount), the Bidding Procedures Order and the Sale Order.  *See Hargrave v. TU. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

62.     Moreover, the Debtor requests that each non-debtor party to an Assumed Contract who fails to object be deemed to have consented to the assumption and assignment of its executory

1   contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on

2   assignment. *See* 11 U.S.C. § 365(c)(1)(B), (e)(2)(A)(ii), and (f).

3       **F.    Waiver Of Bankruptcy Rules Regarding Stay Of Order**

4       63.    To implement the foregoing successfully, the Debtor seeks a waiver of the stay of any

5   order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h), 6006(d) or

6   otherwise.

7       **G.    Reservation of Rights**

8       64.    Nothing contained herein is intended or should be construed as an admission as to the

9   validity or priority of any claim against the Debtor, a waiver of the Debtor's rights to dispute any

10  claim, or an approval or assumption of any agreement, contract, or lease under Section 365 of the

11  Bankruptcy Code.

12  **V.    <u>CONCLUSION</u>**

13      **WHEREFORE**, the Debtor respectfully requests that this Court enter an order, substantially

14  in the form of the Proposed Order attached hereto as **Exhibit 1**, and set the following deadlines,

15  Auction date and Sale Hearing date:

16          a.    **Bidding Deadline**:  December __, 2015, at 6:00 p.m. (prevailing Pacific time)
                  as the deadline by which all binding bids must actually be received pursuant
17                to the Bidding Procedures (the "Bidding Deadline").  Bidders must deliver the
                  necessary bid documents required to participate in the Auction pursuant to the
18                Bidding Procedures to (1) Charles Klaus at cklaus@sbcglobal.net, (2) Susan
                  K. Seflin at sseflin@ebg-law.com, and (3) Jerrold L. Bregman at
19                jbregman@egb-law.com.

20
            b.    **Auction**: December ___, 2015, commencing at 10:00 a.m. (prevailing Pacific
21                time) as the date and time the Auction will commence at the offices of Ezra
                  Brutzkus Gubner LLP, 21650 Oxnard Street, Suite 500, Woodland Hills, CA
22                91367 (or at any such other location or time as the Debtor may hereafter
                  designate in writing to the Qualified Bidders);
23

24          c.    **Sale Objection Deadline**:  the deadline to object to the Sale transactions
                  and/or the assumption and assignment of Assigned Contracts or cure amounts
25                related thereto (to the extent a Cure Notice (as defined herein) has been filed
                  with the Bankruptcy Court) shall be December __, 2015 (the "Sale Objection
26                Deadline"); and

27

28

d.    **Sale Hearing**: December __, 2015, at _____ _.m.. (prevailing Pacific time) as the date and time of the Sale Hearing before this Bankruptcy Court.

DATED:  November 30, 2015                    EZRA BRUTZKUS GUBNER LLP


By: /s/ Susan K. Seflin
        Susan K. Seflin
        Proposed Attorneys for Chapter 11 Debtor
        and Debtor in Possession

## **Exhibit 1**

[Bidding Procedure Order]

## **Exhibit 2**

[Stalking Horse APA – Schedules and Exhibits Not Attached]

## **Exhibit 3**

[Sale Notice]

## **Exhibit 4**

[Cure Notice]

STEVEN T. GUBNER - Bar No. 156593
SUSAN K. SEFLIN - Bar No. 213865
JERROLD L. BREGMAN - Bar No. 149896
EZRA BRUTZKUS GUBNER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email:     sgubner@ebg-law.com
           sseflin@ebg-law.com
           jbregman@ebg-law.com

Proposed Attorneys for Chapter 11 Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Case No. 1:15-bk-13952-MB |
| DigitalSound Production Services, Inc., | Chapter 11 |
| Debtor. | **ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH SALE OF THE DEBTOR'S ASSETS, (B) SCHEDULING HEARING TO CONSIDER THE SALE, AND (C) APPROVING FORM AND MANNER OF NOTICE THEREOF** |

**Hearing:**
Date:     December 2,  2015
Time:     3:30 p.m.
Place:    Courtroom 303
          21041 Burbank Blvd.
          Woodland Hills, California

1

Exh 1_001

On _____, at _____ p.m., a hearing (the "Hearing") was held before the

Honorable _____, United States Bankruptcy Judge for the Central District of California, for

the Court to consider the *Notice of and Emergency Motion for (I) An Order (A) Approving Bidding*

*Procedures in Connection with Sale of the Debtor's Assets, (B) Scheduling Hearing to Consider the*

*Sale, and (C) Approving Form and Manner of Notice Thereof; and (II) an Order Authorizing and*

*Approving (A) the Sale of Substantially All of the Debtor's Assets and (B) Assumption and*

*Assignment of Executory Contracts and Unexpired Leases; Memorandum of Points And Authorities*

[Doc. # ____] (the "Motion") filed by Digitalsound Production Services, Inc., the debtor and debtor

in possession in the above-captioned chapter 11 case (the "Debtor").[1]  Appearances were made as

noted on the record of the Hearing.

The Bankruptcy Court having reviewed the Motion; and it appearing that the Bankruptcy

Court has jurisdiction over this matter; and it appearing that the Motion is a core proceeding

pursuant to 28 U.S.C. § 157(b); and it appearing that venue of this proceeding and the Motion in this

District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and having found that notice of the

Motion was adequate and appropriate under the circumstances; and the Bankruptcy Court being

satisfied, based on the representations made in the Motion and at the hearing on the Motion, that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and

any objections to the relief requested in the Motion having been withdrawn or overruled on the

merits; having set forth the Court's findings of facts an conclusions of law on the record of the

Hearing, and finding good cause appearing therefor,

**IT IS HEREBY FINDS AND ORDERS AS FOLLOWS**:[2]

1.    The Motion is granted as set forth in this Order.

2.    The Court has jurisdiction over this matter and over the Acquired Assets of the Debtor

and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334.  This matter is a

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Motion.

[2] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and vice versa.

1450491

**Exh 1_002**

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O). The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105, 363, 365, and Fed. R. Bankr. P. 2002, 6004, 6006, 9008, 9014 and 9019. Venue of these cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The Debtor has offered good and sufficient reasons for, and the best interests of its estate will be served by, this Court granting the Motion to the extent provided in this Order, including approval of (i) the Bidding Procedures, attached hereto as Annex 1; (ii) the Break-up Fee and Expense Reimbursement recited therein; (iii) the procedures described below for the determination of the amounts necessary to cure defaults under the Assigned Contracts so as to permit the assumption and assignment under section 365 of the Bankruptcy Code of the Assigned Contracts; and (iv) the form and manner of notice of the Auction and Sale Hearing described in the Motion and this Order.

4. Each of the Break-up Fee and the Expense Reimbursement (a) is an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code; (b) is of substantial benefit to the Debtor's estate and the collateral of parties asserting liens, security interests, encumbrances or other interests in and to the Acquired Assets, which are adequately protected from any diminution arising from such Break-up Fee and Expense Reimbursement; (c) is reasonable and appropriate, including in light of the size and nature of the Sale and the efforts that have been and will be expended by Stalking Horse Purchaser notwithstanding that the proposed sale is subject to higher and better offers for the Acquired Assets; (d) was negotiated by the parties at arms' length and in good faith; and (e) necessary to ensure that Stalking Horse Purchaser will continue to pursue its proposed acquisition of the Acquired Assets. The Break-up Fee and the Expense Reimbursement were a material inducement for, and condition of, Stalking Horse Purchaser's entry into the Stalking Horse APA. Thus, assurance to Stalking Horse Purchaser of payment of the Break-up Fee and Expense Reimbursement will promote more competitive bidding by inducing Stalking Horse Purchaser's bid that otherwise would not have been made, and without which bidding would have been limited.

1450491

**Exh 1_003**

5. Good and sufficient notice of the relief sought in the Motion has been given under the circumstances, and no further notice is required except as set forth herein with respect to the Auction and the Sale Haring. Subject to the immediately preceding sentence, a reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

6. The issuance and immediate effectiveness of this Order as of the date hereof, including approval of the Bidding Procedures, is supported by evidence of compelling business justification and other circumstances demonstrating that the relief granted by this Order is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

7. The proposed notice of the Auction, the Sale Hearing and the Bidding Procedures, as set forth in the Motion and this Order, is appropriate and sufficient, and is reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Sale Hearing and the Bidding Procedures, and no other or further notice than as provided for herein shall be required for the Sale or the assumption and assignment of the Assigned Contracts.

8. The Bidding Procedures were negotiated in good faith and at arms' length.

9. The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Acquired Assets. All objections to the entry of this Order or the relief provided herein, that have not been withdrawn with prejudice, waived, resolved or settled are hereby denied and overruled on the merits with prejudice.

10. All Bidders submitting a bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the transfer of the Assets.

11. In the event the Stalking Horse APA is the only Qualified Bid in respect of the Acquired Assets received by the Bidding Deadline, no Auction shall be conducted for the Acquired Assets, and the Stalking Horse Purchaser shall be the Successful Bidder for the Acquired Assets.

12. The following dates and deadlines regarding competitive bidding are hereby established (subject to modification if needed):

    a. **Bidding Deadline**: _____ at 6:00 p.m. (prevailing Pacific Time), is the deadline by which all binding bids must actually be received pursuant to the

4

1450491

**Exh 1_004**

Bidding Procedures (the "Bidding Deadline").  Bidders must deliver the necessary bid documents required to constitute a Qualified Bid (as defined herein) to Charles Klaus at cklaus@sbcglobal.net, Susan Seflin at sseflin@ebg-law.com, and Jerrold L. Bregman at jbregman@ebg-law.com.  The Debtor has the sole discretion to extend the Bidding Deadline prior to the Auction in the exercise of its business judgment subject to the terms of the Stalking Horse APA.

b.      **Auction**: December __ 2015, commencing at 10:00 a.m. (prevailing Pacific time), provided at least one Qualified Bid other than the Stalking Horse APA is timely received, is  the date and time the Auction will commence at the offices of Ezra Brutzkus Gubner LLP, 21650 Oxnard Street, Suite 500, Woodland Hills, CA  91367 (or at any such other location or time as the Debtor may hereafter designate in writing to the Qualified Bidders);

c.      **Sale Objection Deadline**:  the deadline to object to the Sale transactions and/or the assumption and assignment of Assigned Contracts or cure amounts related thereto shall be December __, 2015 (the "**Sale Objection Deadline**").  Failure to timely file an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order, or consummation of the Sale, and shall be deemed to constitute consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto including, without limitation, the Debtor's assumption and assignment to the Successful Bidder all of the Assigned Contracts, and for purposes of section 363(f) of the Bankruptcy Code; and

d.      **Sale Hearing**: December __, 2015 (prevailing Pacific time), is the date and time of the Sale Hearing before this Bankruptcy Court.  Any obligations of the Debtor set forth in the Stalking Horse APA, that are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order pursuant to the Stalking Horse APA are authorized as set forth herein and shall be fully enforceable as of the date of entry of this Order.

13.      The assets to be offered for sale (the "Acquired Assets") consist of substantially all of the estate's assets (other than Excluded Assets), as set forth in more detail in the Stalking Horse APA which is annexed as **Exhibit 2** to the Motion.

14.      The Debtor has and will continue to provide information regarding the Acquired Assets and the Debtor to Bidders and bona fide (as determined by the Debtor) potential Bidders.

15.      The following Bidding Procedures shall govern the submission, receipt and analysis of any bids relating to the sale of the Acquired Assets, and any party desiring to submit a higher or otherwise better offer to purchase the Acquired Assets shall do so strictly in accordance with the terms of the following Bidding Procedures, as potentially modified by the Debtor, following consultation with the Committee, if any.

16.      A "Qualified Bid" for purposes hereof shall mean a Bidder's executed asset purchase agreement ("APA"), submitted as set forth above, in substantially the same form as the asset purchase agreement, dated as of November 30, 2015 ("Stalking Horse APA"), between the Debtor and Atomic

1450491

**Exh 1_005**

1  Lighting LLC ("Stalking Horse Purchaser"), and which satisfies each of the following conditions,

2  each as determined by the Debtor in the exercise of its sole and absolute discretion subject to the

3  terms of the Stalking Horse APA:

4        a.     Minimum Overbid.   The APA shall provide for a purchase price for the

5  Acquired Assets having a **value of not less than $6,230,242** ("Minimum Overbid Price")

6  consisting of $4,095,000 in cash, plus breakup fee of $122,850, plus reimbursement of

7  expenses of $75,000, plus initial overbid amount $57,150 plus the Assumed Liabilities (as

8  defined in the Stalking Horse APA) in the amount of $1,880,242.

9        b.     Written & Irrevocable.   The APA shall be in writing and state that it shall

10  remain irrevocable unless and until the Debtor accepts a higher or otherwise better bid, and

11  until such Bidder is not selected as the Back-Up Bidder (as that term is defined below).

12        c.     Components.   The overbid shall (i) clearly state the consideration to be paid in

13  cash and the consideration to be paid in Assumed Obligations (as defined below); (ii) identify

14  the executory contracts and unexpired leases ("Assigned Contracts") as well as any other

15  obligations to be assumed and assigned to the bidder (together with Assigned Contracts, if

16  any, "Assumed Obligations"); (iii) identify the employees by name or position, if any and if

17  known, whom the Bidder anticipates in good faith that it would likely hire upon the

18  consummation of the prospective transaction; (iv) be clearly marked as a "redline" to show

19  any and all revisions to the Stalking Horse APA..

20        d.     Contingencies.   The APA shall not contain any financing or due diligence

21  contingencies.

22        e.     Deposit.   The APA must be accompanied by a deposit in an amount equal to

23  5% of the cash consideration stated in such Bidder's APA (the "Deposit"), to be submitted to

24  the Debtor in the form of a wire transfer of immediately available funds, certified check or

25  cashier's check, which amount shall be deposited into the attorney-client trust account of

26  Ezra Brutzkus Gubner LLP, and received by such law firm on or before the Bidding

27  Deadline; provided that any and all Deposits shall be non-refundable unless and until the

28  Auction has taken place and the Bidder making the Deposit is not selected as either the

6

**Exh 1_006**

Successful Bidder (as defined below) or Back-Up Bidder (as defined below), in which case the Deposit will be refunded unless otherwise forfeited as a result of a breach by the Bidder. The Deposit of the successful bidder(s) shall, upon consummation of the successful bid, be credited to the purchase price paid for the Acquired Assets.  If any successful bidder fails to consummate the successful bid due to such successful bidder's default, then the Deposit of such successful bidder shall be forfeited to, and retained irrevocably by, the Debtor, and the Debtor shall retain the right to pursue all available remedies. The Deposit of any Bidder whose overbid is not accepted by the Debtor as a Qualified Bid shall be returned to such Bidder within three business days of the Debtor making such determination.  The Deposit of any Bidder who submits a Qualified Bid shall be returned within three (3) business days after (i) consummation of the Sale; and (ii) the Auction (except for the back-up bidder(s)'s Deposit which shall be applied or returned as specified above).

f.      Sale "As Is".   The APA must acknowledge that the sale contemplated thereunder shall be on an "as-is and where-is" basis, and that such Bidder (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or premises in making its Qualified Bid; and (ii) did not any more so than the Stalking Horse APA rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, regarding the Acquired Assets or the completeness of any information provided in connection with its bid.

g.      No Contingencies.  The APA shall acknowledge it is not subject to any due diligence contingencies or financing contingencies of any kind whatsoever.

h.      Demonstrated Capacity.  The APA must be accompanied by sufficient and adequate financial and other information to demonstrate, to the Debtor's satisfaction determined in the Debtor's sole and absolute determination, that such Bidder has the presently existing financial ability to consummate the proposed transactions required by its bid and provide adequate assurance of future performance of all Assumed Obligations.

7

i.      Identity.  The APA shall disclose the identity and contact information of each person or entity that will be participating in connection with such bid, and the complete terms of any such participation.

j.      Authorization.   The APA shall represent that the Bidder has obtained all necessary internal authorization or approval, including from its board of directors (or comparable governing body), with respect to the submission, execution, delivery, and closing of its bid and the transactions contemplated thereby.

k.      Prohibition against Collusive Bidding.   The APA shall include a written statement acknowledging the prohibition against collusive bidding.

l.      No Fees.  The APA shall state that it is not subject to any break-up fee, transaction fee or any similar type of payment from the Debtor to the Bidder.

m.      Consent to Jurisdiction.  The APA shall specify that the Bidder submits to the subject matter and personal jurisdiction of the Bankruptcy Court exercising jurisdiction over the Debtor with respect to the interpretation and enforcement of the Bidding Procedures and any claims arising from or relating to any APA.

17.      The Sale Notice, substantially in the form attached as **Exhibit 3** to the Motion, is hereby approved.  With two business days after the entry of this Order, the Debtor shall file the Sale Notice and serve the Sale Notice via first-class mail, electronic mail or overnight delivery, on (i) all Potential Bidders of whom Debtor is aware; (ii) Debtor's 20 largest unsecured creditors; (iii) counsel to the Creditors' Committee, if any; (iv) all relevant federal, state and local taxing authorities; (v) all parties asserting or known to hold a lien on or security interest in any of the Acquired Assets; (vi) all counter parties to executory contracts and unexpired leases; (vii) the U.S. Trustee; (viii) both shareholders of the Debtor's stock, inclusive of the minority shareholder who is serving as the DIP lender; (ix) any entities that have filed a request for service of filings pursuant to Bankruptcy Rule 2002; and (x) all other parties entitled to notice under Bankruptcy Rule 2002.

18.      Within three (3) business days after entry of this Order, or as soon as practicable thereafter, the Debtor will place a publication version of the Auction and Hearing Notice for one day in the [Wall Street Journal or USA Today] and post it onto the Debtor's website.

8

19.     The Debtor shall evaluate all bids in its sole and absolute discretion.  Bids will be valued based upon several factors as weighted and applied by the Debtor in its sole and absolute discretion, including, without limitation, items such as (i) the purchase price and the net value (including assumed liabilities and other obligations to be assumed by the Bidder) provided by such bid; (ii) the relative ability of the Bidder to consummate the transactions contemplated by its bid; (iii) the nature and extent of any proposed revisions to the Stalking Horse APA; (iv) the effect of the proposed sale on the Debtor's operations and employees; and (v) other factors affecting the speed, certainty, and value of the transactions contemplated by such bid.

20.     The Auction shall be conducted in accordance with the following procedures (the "Auction Procedures"):

    a.     The Auction will be conducted in an open and fair manner as determined by the Debtor in its sole and absolute discretion in consultation with the Committee, if any; provided, that any such other Auction procedures shall not be inconsistent with any order of the Bankruptcy Court or the Stalking Horse APA.

    b.     Each participating Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the sale.

    c.     The Debtor, in its sole and absolute discretion, may approve joint bidding that is openly disclosed to the Debtor.

    d.     The Auction shall be governed by such other procedures as are announced by the Debtor, in its sole and absolute discretion, in consultation with the Committee, if any, from time to time on the record at the Auction; provided, that any such other Auction procedures shall not be inconsistent with any order of the Bankruptcy Court or the Stalking Horse APA.

    e.     Bidding shall continue until such time as the highest and best bid is determined by the Debtor in its sole and absolute discretion in consultation with the Committee, if any.

    f.     The Debtor may recess the Auction at any time and from time to time in its sole and absolute discretion.

9

21.     The Successful Bidder shall take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, financial information and other documents or information for filing with the Bankruptcy Court if necessary (as determined by the Debtor) and making knowledgeable representatives available to testify before the Bankruptcy Court.

22.     In the event that the Stalking Horse Purchaser becomes entitled to the Break-Up Fee and Expense Reimbursement based upon the Debtor selecting another bidder as the Successful Bidder at Auction and providing that the Stalking Horse Purchaser is not in material breach of the Stalking Horse APA, then immediately following the closing of the Acquired Assets to the Successful Bidder and without the need for further order of the Bankruptcy Court, the Debtor shall pay the Break-Up Fee and Expense Reimbursement to the Stalking Horse Purchaser in immediately available funds from the proceeds of such closing, by wire transfer to the account specified by the Stalking Horse Purchaser in writing.

23.     Back-Up Bidders.  At the conclusion of the Auction, the Debtor may designate a Back-Up Bidder or multiple Back-Up Bidders.  If a Back-Up Bidder is selected, such Back-Up-Bidder's Deposit shall be released upon the later to occur of (a) the closing of a transaction with the Successful Bidder, or other Back-Up Bidder; or (b) twenty-two (22) days after the entry of an order approving the Debtor's Sale of the Acquired Assets.  If the Successful Bidder does not close the transaction for any reason, then the Back-Up Bidder's Deposit shall be non-refundable and the Debtor shall close the transaction upon the terms of such Back-Up Bidder's APA as it may have been improved at the Auction.

24.     Closing.  The closing for the sale of the Acquired Assets to the Successful Bidder or Back-Up Bidder (the "Closing") shall be held in the office of counsel for the Debtor, or such other location as is agreed to by the parties, no later than the Closing Deadline unless expressly agreed to in writing by the Debtor and the Successful Bidder or Back-Up Bidder, as applicable.

25.  The procedures set forth below regarding the assumption and assignment of the Assigned Contracts in connection with the sale are hereby approved (the "Assumption Procedures").

10

These Assumption Procedures shall govern the assumption and assignment of all Assigned Contracts that may be assumed and assigned in connection with a sale of the Acquired Assets.

a.   Cure Notice.  The Debtor shall file with the Bankruptcy Court and serve via first-class mail, electronic mail or overnight delivery, the Cure Notice on all non-Debtor counterparties to the Assigned Contracts and their counsel (if known) by no later than December __, 2015.  The Cure Notice shall (i) identify the Assigned Contracts, (ii) provide the Debtor's good faith estimates of the corresponding cure amounts required to cure all outstanding defaults under each of the Assigned Contracts (each, a "Cure Amount"), and (iii) include the deadline by which any counterparty to the Contract or Lease may file an objection to the proposed assumption and assignment and/or the Cure Amount proposed with respect thereto, and the procedures relating thereto; *provided, however*, that service of a Cure Notice shall not constitute an admission that such Contract or Lease is an executory contract or unexpired lease.

b.   Adequate Assurance.  Upon request of the non-Debtor counterparty and by electronic mail, the Debtor shall serve upon such party the evidence of adequate assurance of future performance with respect to the relevant Assigned Contracts(s) provided by the Stalking Horse Purchaser or Successful Bidder(s), including the legal name of the proposed assignee, the proposed assignee's financial ability to perform under the Assumed Contract(s) and the contact information for the person with the proposed assignee whom counterparties may contact if they wish to obtain further information regarding such Stalking Horse Purchaser or Successful Bidder.  The Debtor may but is not required to file such evidence with the Bankruptcy Court; however, the Debtor may file such evidence under seal without any further order of the Bankruptcy Court explicitly authorizing such filing under seal.

c.   Objections.  Objections, if any, to the proposed assumption and assignment or the Cure proposed with respect to any of the Assigned Contracts, must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and any order of the Bankruptcy Court; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, the alleged correct Cure Amount, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Bankruptcy Court by the Sale Objection Deadline (or such later deadline as may be stated in the Cure Notice).

d.   Dispute Resolution. Any objection to the proposed assumption and assignment of any of the Assigned Contracts or related cure proposed in connection with the Sale that remains unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Bankruptcy Court) with no additional notice of such hearing to be required to be filed or otherwise provided); *provided, however*, that with respect to any Assumed Contract to which such objection pertains solely to the Cure Amount proposed with respect thereto, the Debtor may seek at the Sale Hearing to assume such Assumed Contract and assign it to the Successful Bidder; provided further, however, that the Debtor or the Successful Bidder, as applicable, must segregate funds from the net proceeds of the applicable sale equal to the undisputed portion of the applicable Cure Amount pending the resolution of such dispute by the Bankruptcy Court or by agreement of the parties, and pay any amount owed promptly to the applicable counterparty upon such resolution.

e.   **Any party who fails to timely file an objection to its scheduled Cure Amount listed on the Cure Notice or to the assumption and assignment of an Assumed Contract (a) shall be forever barred from objecting thereto, including, without limitation, (i) making any demands for additional Cure Amounts or monetary compensation on account of any alleged defaults against the Debtor, it's estate, the Stalking Horse Purchaser or other Successful Bidder(s) arising from the Auction, if any, with respect to any such Assumed Contract, and (ii) asserting that the Stalking**

1450491

**Exh 1_011**

**Horse Purchaser or other Successful Bidder(s) has not provided adequate assurance of future performance as of the date of the Sale Order and (b) shall be deemed to consent to the Sale.**

f.

26.     As soon as practicable following the conclusion of the Auction, the Debtor shall file a notice identifying the Successful Bidder(s) and the Back-Up Bid, if any, with the Court and serve such notice upon each party identified in the Cure Schedules.  If the Successful Bidder is not the Staking Horse Purchaser, the deadline for objecting to the assignment of the Assigned Contracts to such Successful Bidder on the basis of adequate assurance of future performance shall be the commencement of the Sale Hearing, and, as soon as practicable following the conclusion of the Auction, the Debtor shall file copies of the Successful Bid(s) and the Back-Up Bid with the Court.

27.     The Debtor, after consultation with the Committee, if any, reserves the right to implement additional procedural rules, provided that such lack of conformity is not material and is not inconsistent with any order of the Bankruptcy Court or the APA.

28.     All Interested Parties (whether or not Qualified Bidders) that participate in the Bidding Process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Bankruptcy Court in connection with the Motion or this Order (including any disputes relating to the bidding process, the Auction and/or the Sale) to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution and (b) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters.

29.     The Debtor is authorized to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement and effectuate the transactions contemplated by this Order.

30.     Notwithstanding the applicability of Bankruptcy Rule 6004(h), 6006(d), 7062 and 9014, this Order shall be immediately effective and enforceable upon entry of this Order.  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

12

1450491

**Exh 1_012**

31.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

**IT IS SO ORDERED.**

# # #

1450491

**Exh 1_013**

**DigitalSound Production Services, Inc.**

**Bidding Procedures**

**A.      Bidding Procedures**

1.      Bidding Deadline.  Under these Bidding Procedures, Qualified Bids (as defined below) are due from potential bidders (each a **"Bidder"**) and must be received not later than 6 p.m. (Prevailing Pacific time) on December __, 2015 (**"Bidding Deadline"**) by the Debtor and its legal counsel as follows:   Qualified Bids may be submitted via electronic mail to (1) Charles Klaus at cklaus@sbcglobal.net, (2) Susan K. Seflin at sseflin@ebg-law.com, and (3) Jerrold L. Bregman at jbregman@egb-law.com, unless the Debtor has agreed to other arrangements in writing with such Bidder. The Debtor, in its sole and absolute discretion, may extend the Bidding Deadline for any particular Bidder prior to the Auction (as defined below) subject to the terms of the Stalking Horse APA (as defined below).  The Auction will be held in the event one or more Qualified Bid is received by the Bidding Deadline.

2.      A **"Qualified Bid"** for purposes hereof shall mean a Bidder's executed asset purchase agreement (**"APA"**), submitted as set forth above, in substantially the same form as the asset purchase agreement, dated as of November 30, 2015 (**"Stalking Horse APA"**), between the Debtor and Atomic Lighting LLC ("**Stalking Horse Purchaser**"), and which satisfies each of the following conditions, each as determined by the Debtor in the exercise of its sole and absolute discretion subject to the terms of the Stalking Horse APA:

a.      Minimum Overbid.  The APA shall provide for a purchase price for the Acquired Assets having a **value of not less than $6,230,242** ("**Minimum Overbid Price**") consisting of $4,095,000 in cash, plus breakup fee of $122,850, plus

Exh 1_014

reimbursement of expenses of $75,000, plus initial overbid amount $57,150 plus the

Assumed Liabilities (as defined in the Stalking Horse APA) in the amount of $1,880,242;

      b.      **Written & Irrevocable.**  The APA shall be in writing and state that it shall

remain irrevocable unless and until the Debtor accepts a higher or otherwise better bid,

and until such Bidder is not selected as the Back-Up Bidder (as that term is defined

below);

      c.      **Components.**  The overbid shall (i) clearly state the consideration to be

paid in cash and the consideration to be paid in Assumed Obligations (as defined below);

(ii) identify the executory

      d.       and unexpired leases ("**Assigned Contracts**") as well as any other

obligations to be assumed and assigned to the bidder (together with Assigned Contracts,

if any, "**Assumed Obligations**"); (iii) identify the employees by name or position, if any

and if known, whom the Bidder anticipates in good faith that it would likely hire upon the

consummation of the prospective transaction; (iv) be clearly marked as a "redline" to

show any and all revisions to the Stalking Horse APA;.

      e.      **Contingencies.**  The APA shall not contain any financing or due diligence

contingencies;

      f.      **Deposit.**  The APA must be accompanied by a deposit in an amount equal

to 5% of the cash consideration stated in such Bidder's APA (the **"Deposit"**), to be

submitted to the Debtor in the form of a wire transfer of immediately available funds,

certified check or cashier's check, which amount shall be deposited into the attorney-

client trust account of Ezra Brutzkus Gubner LLP, and received by such law firm on or

before the Bidding Deadline; provided that any and all Deposits shall be non-refundable

2

Exh 1_015

unless and until the Auction has taken place and the Bidder making the Deposit is not selected as either the Successful Bidder (as defined below) or Back-Up Bidder (as defined below), in which case the Deposit will be refunded unless otherwise forfeited as a result of a breach by the Bidder.  The Deposit of the successful bidder(s) shall, upon consummation of the successful bid, be credited to the purchase price paid for the Acquired Assets.  If any successful bidder fails to consummate the successful bid due to such successful bidder's default, then the Deposit of such successful bidder shall be forfeited to, and retained irrevocably by, the Debtor, and the Debtor shall retain the right to pursue all available remedies. The Deposit of any Bidder whose overbid is not accepted by the Debtor as a Qualified Bid shall be returned to such Bidder within three business days of the Debtor making such determination.  The Deposit of any Bidder who submits a Qualified Bid shall be returned within three (3) business days after (i) consummation of the Sale; and (ii) the Auction (except for the back-up bidder(s)'s Deposit which shall be applied or returned as specified above).

g.    Sale "As Is".  The APA must acknowledge that the sale contemplated thereunder shall be on an "as-is and where-is" basis, and that such Bidder (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or premises in making its Qualified Bid; and (ii) did not any more so than the Stalking Horse APA rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, regarding the Acquired Assets or the completeness of any information provided in connection with its bid;

Exh 1_016

h.      No Contingencies.  The APA shall acknowledge it is not subject to any due diligence contingencies or financing contingencies of any kind whatsoever;

i.      Demonstrated Capacity.  The APA must be accompanied by sufficient and adequate financial and other information to demonstrate, to the Debtor's satisfaction determined in the Debtor's sole and absolute determination, that such Bidder has the presently existing financial ability to consummate the proposed transactions required by its bid and provide adequate assurance of future performance of all Assumed Obligations;

j.      Identity.  The APA shall disclose the identity and contact information of each person or entity that will be participating in connection with such bid, and the complete terms of any such participation;

k.      Authorization.  The APA shall represent that the Bidder has obtained all necessary internal authorization or approval, including from its board of directors (or comparable governing body), with respect to the submission, execution, delivery, and closing of its bid and the transactions contemplated thereby;

l.      Prohibition against Collusive Bidding.  The APA shall include a written statement acknowledging the prohibition against collusive bidding;

m.      No Fees.  The APA shall state that it is not subject to any break-up fee, transaction fee or any similar type of payment from the Debtor to the Bidder; and

n.      Consent to Jurisdiction.  The APA shall specify that the Bidder submits to the subject matter and personal jurisdiction of the Bankruptcy Court exercising jurisdiction over the Debtor (**"Bankruptcy Court"** or **"Court"**) with respect to the interpretation and enforcement of these Bidding Procedures and any claims arising from or relating to any APA.

**Exh 1_017**

3.      In the event the Bankruptcy Court approves these Bidding Procedures, the Debtor intends to notice a sale hearing (the **"Sale Hearing"**) for _____, 2015.

4.      The Stalking Horse APA is acknowledged to be a Qualified Bid for purposes hereof.  In the event the Debtor does not receive any other Qualified Bids, the Debtor will seek Court approval to sell the Acquired Assets to the Stalking Horse Purchaser at the Sale Hearing pursuant to the terms of the Stalking Horse APA.

5.      In the event that the Debtor receives, on or before the Bidding Deadline, one or more Qualified Bids, the Debtor shall hold an auction (the **"Auction"**) pursuant to Section 363 of the Bankruptcy Code at the offices of Debtor's counsel, as described below.  At the time of the Auction, the Stalking Horse Purchaser and all Bidders who have submitted a Qualified Bid (each a "**Qualified Bidder**") shall be permitted to overbid for the Acquired Assets in minimum increments of $25,000 over the opening bid, which shall be the highest and best Qualified Bid.  Upon completion of the Auction, the Debtor, in its sole and absolute discretion, shall select the highest and/or best bid (the **"Successful Bid"**) and, if the Debtor so determines in its sole and absolute discretion, the highest and best backup bid ("**Back-Up Bid**").

6.      Free and Clear of Any and All Claims and Interests

Except as may be agreed to by the Successful Bidder, all of the rights, title and interest of the Debtor in and to the Acquired Assets to be acquired as part of the proposed sale shall be sold free and clear of liens, claims, and encumbrances to the extent permitted by Section 363(f) of the Bankruptcy Code, and all associated contract rights shall be assigned, to the extent possible, to the Successful Bidder pursuant to Section 365 of the Bankruptcy Code.

7.      Evaluation of Bids at Auction.  The Debtor shall evaluate all bids in its sole and absolute discretion.  Bids will be valued based upon several factors as weighted and applied by

Exh 1_018

the Debtor in its sole and absolute discretion, including, without limitation, items such as (i) the purchase price and the net value (including assumed liabilities and other obligations to be assumed by the Bidder) provided by such bid; (ii) the relative ability of the Bidder to consummate the transactions contemplated by its bid; (iii) the nature and extent of any proposed revisions to the Stalking Horse APA; (iv) the effect of the proposed sale on the Debtor's operations and employees; and (v) other factors affecting the speed, certainty, and value of the transactions contemplated by such bid.

8.      Time and Date of Auction.  The Auction, if any, shall occur on _____, 2015, commencing at 10:00 a.m. (Prevailing Pacific time), at the offices of Debtor's counsel Ezra Brutzkus Gubner LLP, located at 21650 Oxnard Street, Suite 500, Woodland Hills, CA  91367 (or at any such other location or time as the Debtor may hereafter designate in writing to the Qualified Bidders).

9.      Notices.  The Debtor shall serve notice of the Sale Hearing on (i) all Potential Bidders of whom Debtor is aware; (ii) Debtor's 20 largest unsecured creditors; (iii) counsel to the Creditors' Committee, if any; (iv) all relevant federal, state and local taxing authorities; (v) all parties asserting or known to hold a lien on or security interest in any of the Acquired Assets; (vi) all counter parties to executory contracts and unexpired leases; (vii) the U.S. Trustee; (viii) both shareholders of the Debtor's stock, inclusive of the minority shareholder who is serving as the DIP lender; (ix) any entities that have filed a request for service of filings pursuant to Bankruptcy Rule 2002; and (x) all other parties entitled to notice under Bankruptcy Rule 2002.

10.     Auction Procedures.  The Auction shall be conducted in accordance with the following procedures (the **"Auction Procedures"**):

Exh 1_019

a.       The Auction will be conducted in an open and fair manner as determined by the Debtor in its sole and absolute discretion in consultation with the Committee, if any; provided, that any such other Auction procedures shall not be inconsistent with any order of the Bankruptcy Court or the Stalking Horse APA;

b.       Each participating Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the sale;

c.       The Debtor, in its sole and absolute discretion, may approve joint bidding that is openly disclosed to the Debtor;

d.       The Auction shall be governed by such other procedures as are announced by the Debtor, in its sole and absolute discretion, in consultation with the Committee, if any, from time to time on the record at the Auction; provided, that any such other Auction procedures shall not be inconsistent with any order of the Bankruptcy Court or the Stalking Horse APA;

e.       Bidding shall continue until such time as the highest and best bid is determined by the Debtor in its sole and absolute discretion in consultation with the Committee, if any;

f.       The Debtor may recess the Auction at any time and from time to time in its sole and absolute discretion; and

11.       The Successful Bidder shall take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, financial information and other documents or information for filing with the Bankruptcy Court if necessary

Exh 1_020

(as determined by the Debtor) and making knowledgeable representatives available to testify before the Bankruptcy Court.

12.      Back-Up Bidders.  At the conclusion of the Auction, the Debtor may designate a Back-Up Bidder or multiple Back-Up Bidders.  If a Back-Up Bidder is selected, such Back-Up-Bidder's Deposit shall be released upon the later to occur of (a) the closing of a transaction with the Successful Bidder, or other Back-Up Bidder; or (b) twenty-two (22) days after the entry of an order approving the Debtor's Sale of the Acquired Assets.  If the Successful Bidder does not close the transaction for any reason, then the Back-Up Bidder's Deposit shall be non-refundable and the Debtor shall close the transaction upon the terms of such Back-Up Bidder's APA as it may have been improved at the Auction.

13.      Closing.  The closing for the sale of the Acquired Assets to the Successful Bidder or Back-Up Bidder (the **"Closing"**) shall be held in the office of counsel for the Debtor, or such other location as is agreed to by the parties, no later than the Closing Deadline unless expressly agreed to in writing by the Debtor and the Successful Bidder or Back-Up Bidder, as applicable.

**B.      Assumption and Assignment of Executory Contracts and Unexpired Leases**

1.      The procedures set forth below shall govern the assumption and assignment of the Assigned Contracts that may be assumed and assigned in connection with a sale of the Acquired Asset ("**Assumption Procedures**").

2.      Cure Notice.  The Debtor shall file with the Bankruptcy Court and serve via first-class mail, electronic mail or overnight delivery, the Cure Notice on all non-Debtor counterparties to the Assigned Contracts and their counsel (if known) by no later than December __, 2015.  The Cure Notice shall (i) identify the Assigned Contracts, (ii) provide the Debtor's good faith estimates of the corresponding cure amounts required to cure all outstanding defaults under each

Exh 1_021

of the Assigned Contracts (each, a "**Cure Amount**"), and (iii) include the deadline by which any counterparty to the Contract or Lease may file an objection to the proposed assumption and assignment and/or the Cure Amount proposed with respect thereto, and the procedures relating thereto; *provided, however*, that service of a Cure Notice shall not constitute an admission that such Contract or Lease is an executory contract or unexpired lease.

3.      Adequate Assurance.  Upon request of the non-Debtor counterparty and by electronic mail, the Debtor shall serve upon such party the evidence of adequate assurance of future performance with respect to the relevant Assigned Contracts(s) provided by the Stalking Horse Purchaser or Successful Bidder(s), including the legal name of the proposed assignee, the proposed assignee's financial ability to perform under the Assumed Contract(s) and the contact information for the person with the proposed assignee whom counterparties may contact if they wish to obtain further information regarding such Stalking Horse Purchaser or Successful Bidder. The Debtor may but is not required to file such evidence with the Bankruptcy Court; however, the Debtor may file such evidence under seal without any further order of the Bankruptcy Court explicitly authorizing such filing under seal.

4.      Objections.  Objections, if any, to the proposed assumption and assignment or the Cure proposed with respect to any of the Assigned Contracts, must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and any order of the Bankruptcy Court; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, the alleged correct Cure Amount, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Bankruptcy Court by the Sale Objection Deadline (or such later deadline as may be stated in the Cure Notice).

Exh 1_022

5.      Dispute Resolution. Any objection to the proposed assumption and assignment of any of the Assigned Contracts or related cure proposed in connection with the Sale that remains unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Bankruptcy Court) with no additional notice of such hearing to be required to be filed or otherwise provided); *provided, however*, that with respect to any Assumed Contract to which such objection pertains solely to the Cure Amount proposed with respect thereto, the Debtor may seek at the Sale Hearing to assume such Assumed Contract and assign it to the Successful Bidder; provided further, however, that the Debtor or the Successful Bidder, as applicable, must segregate funds from the net proceeds of the applicable sale equal to the undisputed portion of the applicable Cure Amount pending the resolution of such dispute by the Bankruptcy Court or by agreement of the parties, and pay any amount owed promptly to the applicable counterparty upon such resolution.

**6.      Any party who fails to timely file an objection to its scheduled Cure Amount listed on the Cure Notice or to the assumption and assignment of an Assumed Contract (a) shall be forever barred from objecting thereto, including, without limitation, (i) making any demands for additional Cure Amounts or monetary compensation on account of any alleged defaults against the Debtor, it's estate, the Stalking Horse Purchaser or other Successful Bidder(s) arising from the Auction, if any, with respect to any such Assumed Contract, and (ii) asserting that the Stalking Horse Purchaser or other Successful Bidder(s) has not provided adequate assurance of future performance as of the date of the Sale Order and (b) shall be deemed to consent to the Sale.**

7.      As soon as practicable following the conclusion of the Auction, the Debtor shall file a notice identifying the Successful Bidder(s) and the Back-Up Bid, if any, with the Court and

**Exh 1_023**

serve such notice upon each party identified in the Cure Schedules.  If the Successful Bidder is not the Staking Horse Purchaser, the deadline for objecting to the assignment of the Assigned Contracts to such Successful Bidder on the basis of adequate assurance of future performance shall be the commencement of the Sale Hearing, and, as soon as practicable following the conclusion of the Auction, the Debtor shall file copies of the Successful Bid(s) and the Back-Up Bid with the Court.

8.      The Debtor, after consultation with the Committee, if any, reserves the right to implement additional procedural rules, provided that such lack of conformity is not material and is not inconsistent with any order of the Bankruptcy Court or the APA.

9.      All Interested Parties (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes relating to the bidding process, the Auction and/or the Sale) to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution and (b) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters.

# # #

Exh 1_024

# ASSET PURCHASE AGREEMENT

## By and Between

## DIGITALSOUND PRODUCTION SERVICES, INC.
### (As Seller)

## and

## ATOMIC LIGHTING LLC
### (As Purchaser)

## Dated as of November 30, 2015

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ........................................................................................ 1
  1.1   Certain Terms Defined ................................................................................... 1
  1.2   Interpretation ................................................................................................ 10
  1.3   Incorporation by Reference ......................................................................... 11
ARTICLE 2 PURCHASE AND SALE OF THE ACQUIRED ASSETS ................... 11
  2.1   Purchase and Sale of Assets ........................................................................ 11
  2.2   Excluded Assets ........................................................................................... 12
  2.3   Assumption of Liabilities ............................................................................ 14
  2.4   Excluded Liabilities ..................................................................................... 14
  2.5   Assignment and Assumption of Contracts .................................................. 15
ARTICLE 3 CONSIDERATION ............................................................................... 15
  3.1   Deposit; Purchase Price ............................................................................... 15
  3.2   Closing Date Adjustments Based on Working Capital ................................ 16
  3.3   Closing Date Adjustment Based on Cost of Inventories ............................. 17
  3.4   Allocation of Purchase Price ....................................................................... 18
  3.5   Prorations ..................................................................................................... 18
ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER .................. 18
  4.1   Corporate Organization ............................................................................... 18
  4.2   Authorization and Validity .......................................................................... 18
  4.3   Conflicts; Consents of Third Parties ........................................................... 19
  4.4   Sufficiency of and Title to Acquired Assets ............................................... 20
  4.5   Contracts ...................................................................................................... 20
  4.6   Property ........................................................................................................ 20
  4.7   Intellectual Property .................................................................................... 20
  4.8   Permits ......................................................................................................... 20
  4.9   Employee Benefit Plans ............................................................................... 20
  4.10  Labor Relations ........................................................................................... 21
  4.11  Environmental Matters ................................................................................ 21
  4.12  Insurance ...................................................................................................... 21
  4.13  No Brokers or Finders ................................................................................. 21
  4.14  Litigation; Proceedings ............................................................................... 21
  4.15  Approval and Recommendations ................................................................. 21
  4.16  Compliance with Laws ................................................................................ 22
  4.17  Tax Matters .................................................................................................. 22
  4.18  Inventories ................................................................................................... 22
  4.19  Warranties Are Exclusive ............................................................................ 22
ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF PURCHASER ......... 23
  5.1   Due Organization ......................................................................................... 23
  5.2   Authorization and Validity .......................................................................... 23
  5.3   No Conflict or Violation .............................................................................. 23
  5.4   Consents and Approvals .............................................................................. 23
  5.5   No Physical Count ........................................................................................ 23

Exh 2_002

5.6     No Brokers or Finders................................................................................ 24
5.7     Litigation.................................................................................................... 24
5.8     No Other Representations and Warranties ................................................. 24
ARTICLE 6 COVENANTS AND OTHER AGREEMENTS...................................... 24
6.1     Pre-Closing Covenants of Seller................................................................ 24
6.2     Pre-Closing Covenants of Purchaser ......................................................... 26
6.3     Other Covenants of Seller and Purchaser .................................................. 27
6.4     Employment Covenants and other Undertakings ....................................... 27
6.5     Non-Assignment of Contracts.................................................................... 28
6.6     Casualty...................................................................................................... 29
6.7     Name Change; Use of Name...................................................................... 29
ARTICLE 7 TAXES AND BULK SALE LAWS ......................................................... 30
7.1     Taxes Related to Purchase of Acquired Assets.......................................... 30
7.2     Waiver of Bulk Sales Laws........................................................................ 30
ARTICLE 8 BANKRUPTCY COURT MATTERS ...................................................... 30
8.1     Motions....................................................................................................... 30
8.2     Assigned Contracts .................................................................................... 30
8.3     Procedure .................................................................................................... 31
8.4     Purchaser Protections ................................................................................. 31
ARTICLE 9 CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES............ 31
9.1     Conditions Precedent to the Performance by Seller .................................. 31
9.2     Conditions Precedent to the Performance by Purchaser ............................ 32
ARTICLE 10 CLOSING AND DELIVERIES.............................................................. 33
10.1    Closing........................................................................................................ 33
10.2    Seller's Deliveries ...................................................................................... 34
10.3    Purchaser's Deliveries ............................................................................... 34
ARTICLE 11 TERMINATION ..................................................................................... 34
11.1    Conditions of Termination......................................................................... 34
11.2    Effect of Termination................................................................................. 36
11.3    Break-up Fee and Expense Reimbursement .............................................. 36
ARTICLE 12 INDEMNIFICATION.............................................................................. 37
12.1    Indemnification of Purchaser..................................................................... 37
12.2    Indemnification of Seller ........................................................................... 37
12.3    Limitations on Seller and Purchaser Indemnities ..................................... 38
12.4    Notice of Indemnity Claim ........................................................................ 38
12.5    Resolution of Direct Claims....................................................................... 39
ARTICLE 13 MISCELLANEOUS ............................................................................... 40
13.1    Survival ...................................................................................................... 40
13.2    Further Assurances..................................................................................... 40
13.3    Successors and Assigns.............................................................................. 40
13.4    Governing Law; Jurisdiction...................................................................... 40
13.5    Mediation; Arbitration............................................................................... 40
13.6    Expenses ..................................................................................................... 41
13.7    Severability................................................................................................. 41
13.8    Notices........................................................................................................ 41
13.9    Amendments; Waivers................................................................................ 42

Exh 2_003

13.10    Entire Agreement ............................................................................................ 42
13.11    Seller Disclosures............................................................................................ 42
13.12    Headings .......................................................................................................... 43
13.13    Counterparts .................................................................................................... 43
13.14    Construction .................................................................................................... 43
13.15    Waiver of Jury Trial........................................................................................ 43
13.16    General Release ............................................................................................... 43
13.17    Force Majeure ................................................................................................. 44

Exh 2_004

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of November 30, 2015 (the "Execution Date"), is made by and between DigitalSound Production Services, Inc., a California corporation ("Seller"), and Atomic Lighting LLC, a Pennsylvania limited liability company ("Purchaser").

## RECITALS

WHEREAS, Seller is engaged in the business of providing turn-key lighting, video and sound solutions and installation services for a wide variety of events and productions (the "Business");

WHEREAS, within two (2) Business Days after the Execution Date (the **"Petition Date"**), Seller will file a voluntary petition for reorganization relief (the "Bankruptcy Case") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and in concert with such filing, seek the entry of an order by the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") approving this Agreement and authorizing Seller to consummate the transactions contemplated hereby;

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to acquire and assume from Seller, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Acquired Assets and Assumed Liabilities as more specifically provided herein;

WHEREAS, Seller has determined that it is advisable and in the best interests of the estate of Seller and the creditors of such estate to consummate the transactions provided for herein pursuant to the Bidding Procedures Order and the Bankruptcy Sale Order (as those terms are defined below) and has approved this Agreement;

WHEREAS, certain terms used in this Agreement are defined in Section 1.1; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bankruptcy Sale Order to be entered in the Bankruptcy Case;

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Seller and Purchaser hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Certain Terms Defined.  As used in this Agreement, the following terms have the following meanings:

"<u>Acquired Assets</u>" are those assets described in <u>Section 2.1</u>.

"<u>Action</u>" means any demand, claim, action, suit or proceeding, arbitral action, inquiry, investigation, criminal prosecution or investigation by or before any Governmental Authority.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or use the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allocation Statement</u>" has the meaning set forth in <u>Section 3.4(a)</u>.

"<u>Alternate Transaction</u>" means a transaction or series of related transactions pursuant to which Seller (i) accepts a Qualified Bid, other than that of Purchaser's, as the highest or best offer, or (ii) sells, transfers, leases or otherwise disposes of directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including, but not limited to, a Bankruptcy Court-approved stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a party or parties other than Purchaser, or seeks to do any of the foregoing as set forth in this clause (ii).

"<u>Ancillary Agreement</u>" means any other agreement, document or instrument that Seller or Purchaser, as applicable, enters into in connection with the consummation of the transactions contemplated hereby.

"<u>Assignable Contract</u>" means any Contract to which Seller is a party and is permitted under the Bankruptcy Code to sell and assign, other than an Employee Benefit Plan.

"<u>Assigned Contracts</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Assignment and Assumption Agreement</u>" means the Bill of Sale and Assignment and Assumption Agreement in substantially the form annexed hereto as <u>Exhibit C</u> (a) conveying to Purchaser title to all of the Acquired Assets and (b) evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Assigned Contracts.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Auction</u>" means the auction for the sale of Seller's assets conducted by Seller if any Qualified Bid is received pursuant to the Bidding Procedures Order.

"<u>Bankruptcy Case</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

**Exh 2_006**

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Sale Order" means an order in all material respects in the form of Exhibit A issued by the Bankruptcy Court, which Bankruptcy Sale Order shall be acceptable to Purchaser in its sole discretion and which shall provide, among other things, that the sale of the Acquired Assets to Purchaser shall be free and clear of all liens, claims, interests and encumbrances, and that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code and is not a successor under applicable Law with respect to Seller and the Business.

"Bidding Procedures and Sale Motion" means a motion or motions, in form and substance reasonably satisfactory to Purchaser, to approve the Bidding Procedures Order and the Bankruptcy Sale Order.

"Bidding Procedures Order" means an order, in all material respects in the form of Exhibit B, issued by the Bankruptcy Court that, among other things, establishes procedures for an auction process to solicit competing bids.

"Break-up Fee" means a fee in the amount of One Hundred Twenty-two Thousand Eight Hundred Fifty Dollars ($122,850) to be paid in the circumstances specified in Section 11.3.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in California are authorized by Law or other governmental action to close.

"Business Employees" means employees of the Business on the Execution Date.

"Cash" means all cash (including checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), cash equivalents and short-term investments.

"Casualty" has the meaning set forth in Section 6.6.

"Cineo Lighting" means Cineo Lighting LLC, a California limited liability company.

"Claim" has the meaning ascribed by Bankruptcy Code Section 101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" has the meaning set forth in Section 10.l.

"Closing Date" has the meaning set forth in Section 10.1.

"Closing Date Accounts Payable" means the amount of Seller's accounts payable as of the close of business on the Business Day immediately prior to the Closing Date as determined in accordance with generally accepted accounting principles.

"Closing Date Accounts Receivable" means the amount of Seller's accounts receivable, less fifty percent (50%) of the amount of Seller's accounts receivable aging ninety (90) days or more, as of the close of business on the Business Day immediately prior to the Closing Date as determined in accordance with generally accepted accounting principles.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"Contract" means any Employment Agreement, agreement, contract, lease, sublease, purchase order, arrangement, license, commitment or other binding arrangement or understanding, whether written or oral, and any amendments, modifications or supplements thereto.

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Assigned Contracts so that they may be sold and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Deficiency Amount" has the meaning set forth in Section 3.3.

"Domain Name Assignment" means the Domain Name Assignment in substantially the form annexed hereto as Exhibit D conveying to Purchaser title to all of the Internet domain names listed in Schedule A attached thereto.

"DIP Orders" means the interim and final orders of the Bankruptcy Court approving Seller's entry into debtor-in-possession financing agreements.

"DMV" has the meaning set forth in Section 9.1(g).

"DMV Documents" has the meaning set forth in Section 9.1(g).

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), cost of pricing information, business plans, quality control records and procedures, blueprints, accounting and tax files, all files, customer files and documents (including credit information), personnel files for employees, supplier lists, records, literature and correspondence, including materials relating to Inventories, services, marketing, advertising, promotional materials, Intellectual Property, and other similar materials to the extent related to, used in, held for use in, or with respect to, the Business or the Acquired Assets in each case whether or not in electronic form, whether or not physically located on any of the premises of the Business, but excluding (i) personnel files for employees of Seller who are not hired by Purchaser as of the Closing Date (except records necessary for Purchaser to provide COBRA coverage if required by Law); (ii) Tax Returns of Seller, and (iii) any materials exclusively related to any Excluded Assets.

Exh 2_008

"<u>Employee Benefit Plans</u>" means all (a) employee pension benefit plans as defined in Section 3(2) of ERISA, (b) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (c) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or any other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to a sale of the Business), in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or any ERISA Affiliate and that covers any current or former employee, director, or consultant of Seller (or their dependents, spouses or beneficiaries).

"<u>Employment Agreements</u>" has the meaning set forth in <u>Section 6.4(a)</u>.

"<u>Encumbrances</u>" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, restriction (whether on transfer, disposition or otherwise), third party right, right limited to Seller personally, other agreement term tending to limit any right or privilege of Seller under any Contract, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, casement, license, servitude, proxy, voting trust, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral, or imposed by any Law, equity or otherwise.

"<u>Environmental Laws</u>" has the meaning set forth in <u>Section 4.10</u>.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>ERISA Affiliate</u>" means any trade of business (whether or not incorporated) that is treated as a single employer with Seller under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"<u>Estimated Cash Purchase Price</u>" has the meaning set forth in <u>Section 3.1(c)(i)</u>.

"<u>Estimated Negative Working Capital Adjustment</u>" means Seller's best estimate, as of the time that Seller's Closing Statement is provided, of the Negative Working Capital Adjustment, if any.

"<u>Estimated Positive Working Capital Adjustment</u>" means Seller's best estimate, as of the time that Seller's Closing Statement is provided, of the Positive Working Capital Adjustment, if any.

"<u>Excluded Assets</u>" has the meaning set forth in <u>Section 2.2</u>.

"<u>Excluded Liabilities</u>" has the meaning set forth in <u>Section 2.4</u>.

"<u>Execution Date</u>" has the meaning set forth in the Preamble.

**Exh 2_009**

"Expense Reimbursement" means the documented actual, reasonable out-of-pocket costs and expenses (including, without limitation, fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, documentation and implementation of this Agreement, a letter of intent between Purchaser and Seller dated October 16, 2015, the transactions contemplated hereby, all proceedings incident hereto and related due diligence and analysis, up to a maximum of Seventy-Five Thousand Dollars ($75,000).

"Federal Rules of Bankruptcy Procedure" means the rules of bankruptcy courts promulgated by the United States Supreme Court and published as an appendix to Title 11 of the United States Code.

"FF&E" means all equipment, machinery, fixtures, furniture, vehicles and other tangible property owned by Seller located at any premises of Seller (unless sold to any third party in the ordinary course of business otherwise than in violation of this Agreement) or used or useful in the operation of the Business and Acquired Assets (including all such property that is damaged), including all attachments, signs, cabinets, partitions, wiring, telephones, security systems, floor coverings, wall coverings, office equipment, computers and other information technology hardware, safes, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements.

"Governmental Authority" means any federal, state, provincial, municipal, local court, tribunal, governmental department, agency, board or commission, regulatory or supervisory authority, or other administrative, governmental or quasi-governmental body, subdivision or instrumentality.

"Hazardous Materials" means (a) any petroleum products or byproducts, radioactive materials, friable asbestos or polychlorinated biphenyls or (b) any waste, material, or substance defined as a "hazardous substance," "hazardous material," "hazardous waste" or "pollutant" or otherwise regulated under any applicable Environmental Laws.

"Holdback Amount" has the meaning set forth in Section 3.1(c)(ii).

"Holdback Release Date" shall mean the first anniversary of the Closing Date.

"Improvements" means buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to the Leased Property.

"Indemnitor" has the meaning set forth in Section 12.4(a).

"Intellectual Property" means all rights of Seller in and to (a) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) works of authorship, copyrightable works, copyrights and

Exh 2_010

all applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming service and maintenance notes and logs), (i) Software, (g) Internet addresses, uniform resource locaters, domain names, websites and web pages, (h) any and all other intellectual property and proprietary rights, (i) company-wide telephone numbers and (j) goodwill related to all of the foregoing; in each case to the extent used or useful in the operation of the Business or related to the Acquired Assets.

"Interest" means "interest" as that term is used in Bankruptcy Code Section 363(f).

"Inventories" means all inventories of materials, work-in-process, finished goods and supplies owned or held for rent, lease or sale by Seller or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"Inventories Cost" has the meaning set forth in Section 3.3.

"Inventories Cost Adjustment Amount" has the meaning set forth in Section 3.3.

"Law" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise, or any order, judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"Leased Property" means all the real or personal property leased, subleased or licensed by Seller, which are described on Schedule 2.1(c), but shall not include any other leased real or personal property.

"Lien" has the meaning given to that term in the Bankruptcy Code.

"Local Bankruptcy Rules" means the local rules of bankruptcy courts promulgated under Rule 9029(a) of the Federal Rules of Bankruptcy Procedure for the Bankruptcy Court.

"Material Adverse Effect" means a state of facts, event, change or effect with respect to the Business, Acquired Assets, the Assumed Liabilities or the enforceability of any Assigned Contract that results, or could reasonably be expected to result, in a material adverse effect on the value of the Acquired Assets or the Business, taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to the (a) industry of which the Business is a part generally; (b) changes in economic, regulatory or political conditions generally; (c) the usual, customary or ordinary consequences of the filing by a debtor of a Bankruptcy Case contemplating a reorganization or liquidation of the debtor's assets; and (d) any consequences to the Business resulting from the announcement of the sale transaction contemplated by this Agreement and the process to obtain approval of the procedures to obtain approval thereof.

Exh 2_011

"Negative Working Capital Adjustment" means the amount, if any, by which the Working Capital Amount is greater than Four Hundred Thousand Dollars ($400,000).

"Orders" means the Bankruptcy Sale Order and the Bidding Procedures Order.

"Organizational Amendments" has the meaning set forth in Section 6.7.

"Pacoima Lease" has the meaning set forth in Section 2.2(a).

"Pending Claims" means the dollar amount of Indemnity Claims by Purchaser or other Indemnitees under Article 12 that are pending as of the Holdback Release Date.

"Permits" means all certificates of occupancy or other certificates, permits, authorizations, filings, approvals and licenses used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"Permitted Exceptions" has the meaning set forth in Section 4.4.

"Permitted Liens" means: (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) statutory liens arising in the ordinary course of business that are not overdue and that do not materially affect the value or use of the affected asset; (c) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation; (d) easements, rights-of-way, restrictions and other similar encumbrances other than monetary encumbrances, judgments and monetary liens that in each case do not in any case materially detract from the value or use of the property subject thereto or materially interfere with the ordinary conduct of the business of Seller at the property subject thereto, and (e) any lien that may result by entering into customer agreements in the ordinary course of business and liens arising from customary software escrows.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Positive Working Capital Adjustment" is the amount, if any, by which the Working Capital Amount is less than Four Hundred Thousand Dollars ($400,000).  For example, if the Closing Date Accounts Payable are less than the Closing Date Accounts Receivable by One Hundred Thousand Dollars ($100,000), the Positive Working Capital Adjustment is Five Hundred Thousand Dollars ($500,000).

"Purchaser" has the meaning set forth in the Preamble.

"Purchase Price" has the meaning set forth in Section 3.1(b).

"Qualified Bid" means a competing bid pre-qualified for the Auction in accordance with the Bidding Procedures Order.

Exh 2_012

"Related Persons" means, with respect to any Person, all present and future directors, officers, members, managers, stockholders, employees, controlling persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

"Released Claims" has the meaning set forth in Section 13.16.

"Resolved Claims" means the amount of Indemnity Claims by Purchaser or other Indemnitees under Article 12 that have been resolved by the Holdback Release Date.

"Sale Hearing" means the hearing to consider the entry of the Bankruptcy Sale Order.

"Schedules" has the meaning set forth in Section 6.3(a).

"Seller" has the meaning set forth in the Preamble.

"Seller's Closing Statement" means the statement provided by Seller pursuant to Section 3.2(a).

"Seller's Knowledge" means the actual knowledge of Charles G. Klaus or Gregory Schroeder, in each case after due inquiry.

"Software" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"Subsidiary" means any Person whose securities or other ownership interests are owned or controlled, directly or indirectly, in whole or in any part, by Seller, or which is otherwise owned or controlled, directly or indirectly, in whole or in any part, by Seller.

"Tax" or "Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous, or similar provision under Law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, health, and other government pension plan premiums or contributions, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workers' compensation, customs duties, registration, documentary, value-added, goods and services, harmonized sales,

Exh 2_013

alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Transaction Taxes" has the meaning set forth in Section 7.1.

"Transferred Employees" has the meaning set forth in Section 6.4(a).

"Working Capital Amount" means the amount equal to the amount of Closing Date Accounts Payable minus the amount of Closing Date Accounts Receivable.

1.2    Interpretation.  When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(f)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(g)    Any reference in this Agreement to "$" shall mean U.S. dollars.

Exh 2_014

(h)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

1.3     <u>Incorporation by Reference</u>.  The Recitals set forth above are incorporated herein by reference.

## ARTICLE 2
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1     <u>Purchase and Sale of Assets</u>.   Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Acquired Assets, free and clear of all Liens, Claims, Interests or Encumbrances (other than Permitted Liens). Purchaser shall be entitled to assign all or a portion of its rights under this Agreement to one or more Affiliates.  "<u>Acquired Assets</u>" shall mean all of the direct or indirect, right, title and interest of Seller in and to the tangible and intangible assets, properties, rights, claims and Contracts related to the Business (but excluding Excluded Assets) as of the Closing, including, but not limited to:

(a)     all accounts receivable, rebates, refunds and other receivables of Seller;

(b)     all Inventories;

(c)     all rights of Seller under each lease and any related agreement for the Leased Property set forth on <u>Schedule 2.1(c)</u>, in each case together with Seller's interests in and to all Improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and Seller's rights in respect thereof;

(d)     all FF&E, including the vehicles owned by Seller that are listed on <u>Schedule 2.1(d)</u>;

(e)     all Intellectual Property, including, without limitation, all trademarks, service marks, trade names and corporate names of Seller and all rights to the DPSinc.com website;

(f)     all Assigned Contracts;

(g)     all Documents; provided that Seller shall be entitled to retain copies thereof to the extent reasonably required for the administration of Seller's bankruptcy estate;

(h)     all Permits to the extent assignable;

(i)     all rights under or arising out of all insurance policies relating to the Acquired Assets, unless non-assignable as a matter of law;

(j)     all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties, including non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction;

(k)     any rights, Claims or causes of action of Seller for Claims arising out of the Assigned Contracts;

(l)     all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Seller or to the extent affecting any Acquired Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets; and

(m)     all goodwill and other intangible assets associated with the Business and the Acquired Assets, including customer and supplier lists.

2.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded Assets. For all purposes of and under this Agreement, the term "<u>Excluded Assets</u>" includes:

(a)     all Cash, deposits (including with respect to corporate credit cards), lease deposits (including with respect to the leases for the Leased Properties in Pacoima (the "<u>Pacoima Lease</u>") and Burbank as well as the standing letter of credit in the approximate amount of $350,000), deposits from subtenants, depository accounts, bank balances (including with Union Bank), and marketable securities and other liquid assets;

(b)     any asset of Seller that otherwise would constitute an Acquired Asset but for the fact that it is conveyed, leased or otherwise disposed of in the ordinary course of Seller's business prior to the Closing Date otherwise than in violation of this Agreement;

(c)     the corporate books and records of internal corporate proceedings, tax records, work papers and other records that Seller is required by Law to retain; provided, however, that copies of the foregoing items shall be provided by Seller to Purchaser upon Purchaser's request;

(d)     the rights of Seller under this Agreement and all cash and non-cash consideration payable or deliverable to Seller under this Agreement, but excluding cash flows under any Assigned Contract or any net profits generated by operation of the Business after the Closing Date;

(e)     all rights and interests in connection with and assets of any Employee Benefit Plan;

(f)     all capital stock, partnership interests or other interests which Seller may hold in any corporation, partnership or other entity, including, without limitation, Seller's interests in Cineo Lighting;

Exh 2_016

(g)      all of Seller's rights and interests in and to that certain documentary movie named *Hillsong Let Hope Rise*;

(h)      all personnel records and other records relating to the employees of the Business who do not become employees of Purchaser upon the Closing or that Seller otherwise is required by law to retain in its possession;

(i)      the right to recover from Anthony Dever and Patrick Whalen any amounts that they may owe to Seller, resulting from any claim, agreement or instrument of any kind;

(j)      all known and unknown, liquidated or un-liquidated, contingent or fixed, claims, rights or causes of action which Seller may have against any third party, including, without limitation, any insurance claims and the proceeds thereof except as set forth in Sections 2.1(i);

(k)      all rights under or arising out of insurance policies except as set forth in Section 2.1(i);

(l)      all Tax Returns of Seller and Seller's rights to receive Tax refunds;

(m)      all prepaid charges, sums and fees, insurance refunds and all other rights to refunds pertaining to the Business, including, without limitation, any prepaid insurance premiums, and security deposits;

(n)      notes receivable, negotiable instruments, chattel paper, rights of offset, pre-paid expenses, employee advances, advances and prepayments;

(o)      all claims and causes of action of Seller, including, but not limited to, any claim or cause of action of Seller to avoid and recover preferential and/or fraudulent transfers, including any lien avoidance actions and avoidance claims and causes of action under Sections 544, 547, 548 and 553 of the Bankruptcy Code, Section 1800 of the California Code of Civil Procedure, or under any other applicable state or federal laws, or the proceeds of any of the foregoing; notwithstanding the foregoing, Seller shall irrevocably waive and release any claim or cause of action arising under Chapter 5 of the Bankruptcy Code relating to the Business and Acquired Assets, including any actions against or otherwise involving any counterparty to any Assigned Contract, any Transferred Employees, and/or any of Seller's vendors or trade creditors that do business with Purchaser within ninety (90) days after Closing;

(p)      any third-party owned items, any equipment that belongs to third parties, postage equipment, rental equipment, leased property, consignment goods, personal property of employees (subject to any rights of Seller arising under work for hire or similar doctrines), software subject to licensing agreements, any leases (other than the Assumed Leases), licenses or contracts that are not assignable without prior consent;

(q)      all of Seller's interest under any contracts, agreements or instruments which Purchaser elects not to assume or which Purchaser elects to reject;

(r)      any equity interest of Seller or any of its Subsidiaries, if applicable;

Exh 2_017

(s)     all Permits to the extent they are not assignable;

(t)     computer servers storing the financial and business records of the Company together with all software located on servers; provided that Purchaser will acquire the Company's inventory management software and Podio software; and provided further that Purchaser shall be entitled to copies of such records;

(u)     a copy of all Documents and other materials of Seller or in Seller's possession that are relevant for litigation purposes;

(v)     all records of Seller which specifically and exclusively pertain to the Excluded Assets and the Excluded Liabilities;

(w)     the assets listed on Schedule 2.2(w);

(x)     all tax attributes of Seller;

(y)     all Contracts that are not Assigned Contracts; and

(z)     All rights of Seller under this Agreement and the other agreements and instruments executed and delivered in connection with this Agreement.

2.3     Assumption of Liabilities.  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge the following liabilities and obligations (the "Assumed Liabilities"):

(a)     All of Seller's liabilities and obligations under the Assigned Contracts (including the Employment Agreements and the Pacoima Lease) accruing after the Closing; provided that Purchaser shall not have any liability with respect to Cure Amounts; and

(b)     Accrued vacation, and other paid time-off, of the Transferred Employees as of the Closing Date and gross payroll liabilities and obligations to the Transferred Employees (including payroll taxes accrued and unpaid) arising from and after the Closing Date, but excluding all liabilities and obligations (i) relating to worker's compensation claims that remain unpaid as of the Closing Date (whether reported or not), (ii) relating to the exempt or non-exempt status of any Transferred Employee, (iii) relating to litigation, including, without limitation, any claims for wrongful termination, any claims under Title VII of the Civil Rights Act of 1964, as amended, or similar state law, and any whistleblower claim, (iv) arising from a breach of any obligation under any Contract or Law, and/or (v) retained by Seller in accordance with Section 6.4(d)).

2.4     Excluded Liabilities.  Purchaser shall not assume or be liable for any Claims, Liens, Encumbrances or Interests or any other liabilities and obligations of Seller of any nature whatsoever, whether presently in existence or arising hereafter other than the Assumed Liabilities (the "Excluded Liabilities"). For the avoidance of doubt, Purchaser shall not assume or be liable for (a) any liabilities and obligations that are the subject of litigation or arbitration as of the Closing Date, or that arose prior to the Closing Date and are asserted thereafter, including

Exh 2_018

any such liabilities or obligations that otherwise would be Assumed Liabilities; (b) any payroll obligations arising prior to Closing; or (c) any obligation to pay Taxes of Seller.

2.5     <u>Assignment and Assumption of Contracts</u>.  At Closing, Seller shall, pursuant to the Bankruptcy Sale Order and the Assignment and Assumption Agreement and other transfer and assignment documents reasonably requested by Purchaser, assume and sell and assign to Purchaser (the consideration for which is included in the Purchase Price), the Contracts listed on <u>Schedule 2.5</u> and such additional Assignable Contracts that are set forth on a supplement to <u>Schedule 2.5</u> (identifying the name, parties and date of each such Contract) provided by Purchaser to Seller on or before the date that is three (3) days prior to the date set for the Auction (provided that Seller provide written notice to Purchaser of the date of the Auction at least seven (7) days prior to the date on which the Auction is to begin) (the "<u>Assigned Contracts</u>"). Purchaser shall assume and agree to perform and discharge the Assumed Liabilities under the Assigned Contracts, pursuant to the Assignment and Assumption Agreement. On or before two (2) Business Days after the Bidding Procedures Order has been entered, Seller shall file with the Bankruptcy Court and provide to Purchaser a schedule setting forth all Cure Amounts for all Assigned Contracts. Seller shall pay all Cure Amounts.  From and after the Execution Date, Seller shall not reject any Assigned Contract unless otherwise agreed to in writing by Purchaser. Seller shall provide timely and proper written notice of the motion seeking entry of the Bankruptcy Sale Order to all parties to Assigned Contracts and take all other actions necessary to cause such Assigned Contracts to be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, and Purchaser shall, at or prior to Closing, comply with all requirements under Section 365 necessary to assign to Purchaser the Assigned Contracts. Purchaser and Seller agree that there shall be excluded from the Acquired Assets any Assigned Contracts that are not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing, and the Closing shall proceed with respect to the remaining Acquired Assets without reduction to the Purchase Price, subject to Purchaser's termination right set forth in <u>Sections 6.6</u> and <u>11.1</u>.

## ARTICLE 3
## CONSIDERATION

3.1     <u>Deposit; Purchase Price</u>.

(a)     <u>Deposit</u>.  Upon execution of this Agreement, Purchaser shall deliver a deposit (the "<u>Deposit</u>") in the amount of Two Hundred Thousand Dollars ($200,000), payable by wire transfer in immediately available U.S. funds, to Seller's counsel (the "<u>Deposit Escrow Agent</u>"), to be deposited into a separate, non-interest bearing account, and Purchaser's executed Form W-9 setting forth its federal taxpayer identification number.  The Deposit shall be held by the Deposit Escrow Agent and disbursed in accordance with this Agreement.  In the event that the conditions set forth in <u>Section 9.2</u> have been satisfied and Purchaser fails to consummate the transactions contemplated under this Agreement, the Deposit shall become the property of Seller. In the event that the transactions are not consummated for any other reason (except in the event of a material breach of this Agreement by Purchaser which has not been cured in all material respects within five (5) Business Days after written notice of such breach from Seller to Purchaser which notice includes reasonable detail with respect to such breach, other than a

Exh 2_019

failure to pay the Purchase Price which shall have no cure period beyond the Closing Date), the Deposit shall be returned to Purchaser within three (3) days of termination of this Agreement.

(b)     Subject to the right (but not obligation) to overbid at the Auction in consideration of the sale of the Business and Acquired Assets to Purchaser, and in reliance upon the representations, warranties, covenants and agreements of Seller set forth herein, and upon the terms and subject to the conditions hereinafter set forth, the purchase price (the "Purchase Price") for the Business and Acquired Assets shall be:

(i)     Four Million Ninety-Five Thousand Dollars ($4,095,000) (the "Base Purchase Price") plus the Positive Working Capital Adjustment, if any, minus the Negative Working Capital Adjustment, if any (together with the Base Purchase Price, the "Cash Purchase Price"); plus

(ii)     assumption of the Assumed Liabilities.

(c)     The Cash Purchase Price shall be payable as follows:

(i)     At Closing, Purchaser shall pay to Seller an amount equal to ninety percent (90%) of the Estimated Cash Purchase Price less the amount of the Deposit, which shall be released by Seller's counsel to Seller.  The "Estimated Cash Purchase Price" shall equal: (i) the Base Purchase Price, plus (ii) the Estimated Positive Working Capital Adjustment, if any, minus (iii) the Estimated Negative Working Capital Adjustment, if any, minus the Inventories Cost Adjustment Amount; and

(ii)     On the Holdback Release Date, Purchaser shall pay to Seller in cash an amount equal to ten percent (10%) of the Estimated Cash Purchase Price (the "Holdback Amount"), as adjusted pursuant to Section 3.2; provided that the Holdback Amount paid on the Holdback Release Date shall be reduced by the sum of the amounts of any Resolved Claims and any Pending Claims.  Additional payments shall be made by Purchaser to Seller from the Holdback Amount to the extent that (and promptly after) any Pending Claims are finally resolved for amounts less than the amount of any Pending Claims.

3.2     Closing Date Adjustments Based on Working Capital.

(a)     At least two (2) Business Days prior to the Closing Date, Seller shall deliver to Purchaser Seller's Closing Statement which shall include calculations in reasonable detail of the Estimated Positive Working Capital Adjustment or the Estimated Negative Working Capital Adjustment, as applicable.  Seller's Closing Statement shall be the basis for the payments at Closing pursuant to Section 3.1(b)(i), provided that it is reasonably acceptable to Purchaser.

(b)     Within sixty (60) days after the Closing Date (the "True Up Date"), Purchaser shall provide Seller with Purchaser's calculations of the Cash Purchase Price including the Positive Working Capital Adjustment or Negative Working Capital Adjustment (the "True Up Calculation").  Purchaser will provide Seller or its authorized designee(s) access to the books and records used to calculate the True Up Calculation, on reasonable advance notice and during normal business hours.  If Seller accepts the True Up Calculation, or if Seller fails to give notice to Purchaser of any objection within twenty (20) days after receipt of the True Up Calculation,

Exh 2_020

the True Up Calculation shall be the final and binding calculation of the Purchase Price adjustments set forth in Section 3.2(c) (the "Purchase Price Adjustments"). If Seller gives notice to Purchaser of an objection to the True Up Calculation within twenty (20) days after receipt of the True Up Calculation, Purchaser and Seller shall attempt in good faith to resolve their differences. If Purchaser and Seller are able to resolve their differences within thirty (30) days after Seller gives notice to Purchaser of any objection, the True Up Calculation, as modified to reflect the resolution of the differences between Purchaser and Seller, shall be the final and binding calculation of the Purchase Price Adjustments. If, however, Purchaser and Seller are unable to resolve their differences, Purchaser and Seller shall submit any disputed items to an independent certified public accountant reasonably satisfactory to Purchaser and Seller for a resolution of the dispute, and if Purchaser and Seller cannot agree on such accountant, the dispute shall be resolved by the Bankruptcy Court. The determination of the independent certified public accountant or the Bankruptcy Court shall be final and binding on Purchaser and Seller, and the True Up Calculation, as modified to reflect (A) those differences, if any, that Purchaser and Seller were able to resolve, and (B) the independent certified public accountant's determination or resolution by the Bankruptcy Court with regard to the remaining disputed items, shall be the final and binding resolution of the Purchase Price Adjustments. Purchaser and Seller shall share equally the costs and expenses of such independent public accountant.

(c)     After the True Up Calculation is finally determined, the following Purchase Price Adjustments, as applicable, shall be made:

(i)     If the actual Cash Purchase Price as determined by the True Up Calculation is greater than the Estimated Cash Purchase Price, Purchaser shall pay the difference to Seller within five (5) Business Days after the True Up Calculation is finally determined.

(ii)     If the actual Cash Purchase Price as determined by the True Up Calculation is less than the Estimated Cash Purchase Price, the Holdback Amount shall be reduced by such amount. Absent fraud, Seller shall not be liable for any such reduction in excess of the Holdback Amount.

(d)     Solely for example purposes, attached hereto as Exhibit E is a sample calculation of the True Up Calculation.

3.3     Closing Date Adjustment Based on Cost of Inventories. Immediately upon conclusion of the physical inventory count conducted by the independent third-party firm engaged by Purchaser as contemplated by Section 5.5 (and in any event prior to the Closing), Purchaser shall deliver to Seller a report summarizing the results of such physical inventory count. Such report shall reflect the aggregate quantity of the rental equipment Inventories determined by such firm as compared against Seller's Rental Inventory Report as set forth in Schedule 4.4(b) to determine whether the extended cost of the rental equipment Inventories (the "Inventories Cost") is less than Twelve Million Six Hundred Thousand Dollars ($12,600,000). To the extent that the Inventories Cost is less than Twelve Million Six Hundred Thousand Dollars ($12,600,000) (the "Deficiency Amount"), Purchaser shall be entitled to a credit to the Purchase Price in an amount equal to thirty-two and one-half percent (32.5%) of the Deficiency Amount (the "Inventories Cost Adjustment Amount") which shall be reduced from the Purchase Price as set forth in Section 3.1(c).

3.4     Allocation of Purchase Price.

(a)     Within the earlier of (i) one hundred twenty (120) days after the Closing Date and (ii) twenty (20) days prior to the extended due date of the Tax Returns to which IRS Form 8594 shall be attached, Purchaser shall deliver to Seller a statement (the "Allocation Statement") allocating, for tax purposes, the consideration paid by Purchaser for the Acquired Assets among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

(b)     The parties to this Agreement hereby agree to (i) be bound by the Allocation Statement, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any corresponding other Tax forms) and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including, without limitation, in any audit, judicial or administrative proceeding).

(c)     Purchaser hereby agrees to indemnify Seller in connection with the requirements of this Section 3.4 as required by Section 12.2(c).

3.5     Prorations.  For avoidance of doubt, (a) real estate and personal property taxes with respect to the twelve-month period ending June 30 as to real estate taxes (twelve-month period ending December 31 as to personal property taxes) payable by the tenant under the Pacoima Lease shall be allocated between Seller and Purchaser based on the number of days each was the tenant during the applicable period, regardless of when such taxes are billed; and (b) utilities and other charges (other than taxes) payable by the tenant under the Pacoima Lease shall be allocated between Seller and Purchaser based on the number of days each was the tenant during the month (or other applicable billing period) in which Closing occurs, regardless of when such charges are billed.

# ARTICLE 4
# REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as of the Execution Date and as of the Closing Date as follows:

4.1     Corporate Organization.  Seller is duly organized, validly existing and in good standing under the Laws of the State of California.  Seller has all necessary power and authority to own, lease and operate its properties and to conduct the Business in the manner in which the Business is currently being conducted. Except as set forth in Schedule 4.1, Seller is qualified to do business and is in good standing in all jurisdictions where it leases real property in connection with the operation of the Business or otherwise conducts the Business, except where the failure to so qualify or to so be in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.  Other than Cineo Lighting in which Seller holds a passive minority interest, Seller has no Subsidiaries.

4.2     Authorization and Validity.  Subject to entry of the Bankruptcy Sale Order and each authorization as is required by the Bankruptcy Court:

Exh 2_022

(a)    Seller has all necessary corporate power and authority to execute and deliver this Agreement and each Ancillary Agreement to which it is or will become a party and to perform its obligations hereunder and thereunder;

(b)    the execution, delivery and performance of this Agreement and each Ancillary Agreement to which Seller is or will become a party and the consummation of the transactions contemplated hereby and thereby have been, or at the time of execution will be, duly authorized by all necessary corporate action on the part of Seller, and no other corporate proceedings (shareholder, director or otherwise) on the part of Seller are necessary to authorize such execution, delivery and performance; and

(c)    this Agreement and each Ancillary Agreement to which Seller is or will become a party have been, or when executed will be, duly executed and delivered by Seller and (assuming the due authorization, execution and delivery by Purchaser) this Agreement and each Ancillary Agreement to which Seller is or will become a party constitutes, or will constitute, when executed and delivered, the valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.3    <u>Conflicts; Consents of Third Parties.</u>

(a)    The execution, delivery and performance by Seller of this Agreement and each Ancillary Agreement, the consummation of the transactions contemplated hereby and thereby, and compliance by Seller with any of the provisions hereof do not, or will not at the time of execution, result in the creation of any Lien upon the Acquired Assets and do not, or will not at the time of execution, conflict with, or result in any material violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provisions of:

(i)    Seller's articles of incorporation and by-laws or other organizational documents;

(ii)    subject to entry of the Bankruptcy Sale Order, any Assigned Contract or Permit to which Seller is a party or by which any of the Acquired Assets are bound, except for any anti-assignment provisions set forth in commercially available software licenses;

(iii)    subject to entry of the Bankruptcy Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to Seller or any of the properties or assets of Seller as of the Execution Date; or

(iv)    subject to entry of the Bankruptcy Sale Order, any applicable Law.

(b)    Subject to entry of the Bankruptcy Sale Order, except for any anti-assignment provisions set forth in commercially available software licenses, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement or any other agreement, document or

Exh 2_023

instrument contemplated hereby or thereby to which it is or will become a party, the compliance by Seller with any of the provisions hereof or thereof; the consummation of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Acquired Assets.

4.4   Sufficiency of and Title to Acquired Assets.

(a)   Schedule 4.4(a)(i) sets forth a complete list, as of the Execution Date, of all Liens to which the Acquired Assets are subject.  Seller has good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than any permitted exceptions set forth on Schedule 4.4(a)(ii) hereto (the "Permitted Exceptions") and Permitted Liens, and Purchaser will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than the Permitted Exceptions and Permitted Liens.

(b)   The Acquired Assets constitute all of the assets (whether real, personal or mixed and whether tangible or intangible) reasonably necessary and sufficient to permit the conduct of the Business in the same manner as conducted by Seller prior to the Closing. Attached as Schedule 4.4(b) is a listing of all (i) Acquired Assets that are held for rental to customers; and (ii) FF&E.

4.5   Contracts.  Schedule 4.5 sets forth a complete list, as of the Execution Date, of all Contracts to which Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets. Purchaser has received true and complete copies of such Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the Execution Date.  Except as set forth on Schedule 4.5 and except for such breaches as would be cured in full by payment of any applicable Cure Amounts, Seller is not in breach of any Contract in any material respect and, to Seller's Knowledge, no other party to any Contract is in breach thereof in any material respect.

4.6   Property.  Seller does not own any real property.

4.7   Intellectual Property.  Schedule 4.7 sets forth the Intellectual Property owned by Seller (as opposed to Intellectual Property of which Seller is a licensee).  Except as set forth on Schedule 4.7, to Seller's Knowledge, (i) with respect to any Intellectual Property owned by Seller (as opposed to Intellectual Property of which Seller is a licensee), Seller has all right, title and interest in and to its Intellectual Property, without any conflict with the rights of others, (ii) no Person other than Seller has the right to use the Intellectual Property owned by Seller, and (iii) Seller has the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in the Business that is owned by a party other than Seller.

4.8   Permits.  Schedule 4.8 sets forth a list of all Permits held by Seller.

4.9   Employee Benefit Plans.  Schedule 4.9 sets forth a list of each Employee Benefit Plan.  Current and complete copies of all Employee Benefit Plans have been made available to Purchaser.

Exh 2_024

4.10    Labor Relations.  There are no union contracts, collective bargaining agreements, letters of understanding or other arrangements, formal or informal, with any union or labor organization covering Seller's employees or contractors and none of such employees or contractors are represented by any union or labor organization.  No unfair labor practice complaint against Seller or the Business is pending before any Governmental Authority. To Seller's Knowledge, there is no strike, organizing or certification activity or other labor issues actually pending, being threatened against, or affecting the Business.

4.11    Environmental Matters.  The Acquired Assets are in compliance in all material respects with all applicable Laws, regulations, or other legal requirements relating to the protection of the environment or human health and safety as it relates to Hazardous Materials ("Environmental Laws").  Seller has not received written notice of any Action relating to or arising under Environmental Laws with respect to Seller, any property leased by Seller, the Acquired Assets or the Business, nor, to Seller's Knowledge, are any of the same being threatened.  Seller has not received any written notice of, or entered into, any obligation, order, settlement, judgment, injunction, or decree involving outstanding requirements relating to or arising under Environmental Laws.  There has been no release of any Hazardous Material into the environment at, onto, or from any property leased by Seller that would reasonably be expected to result in material liability, costs or Claims relating to any Environmental Laws.

4.12    Insurance.  Seller maintains the insurance policies set forth on Schedule 4.12, which Schedule sets forth all insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect. Seller has paid all premiums on such policies due and payable prior to the Execution Date. Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

4.13    No Brokers or Finders.  No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Seller in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions, other than as set forth on Schedule 4.13, the fees and expenses of which Seller shall bear.

4.14    Litigation; Proceedings.  Except as set forth in Schedule 4.14, there is no Action pending or, to Seller's Knowledge, threatened against or related to the Business or Seller. Except as set forth in Schedule 4.14, none of the Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any settlement agreement with any Person.

4.15    Approval and Recommendations.  Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement, the Bidding Procedures Order and the Bankruptcy Sale Order regarding the solicitation of and ability to accept an Alternate Transaction, a sale, assignment and assumption of the Acquired Assets and Assumed Liabilities pursuant to this Agreement under Sections 105, 363 and 365 of the Bankruptcy Code is in the best interests of Seller.

**Exh 2_025**

4.16    Compliance with Laws.  Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws in all material respects, and (ii) holds all material Permits, concessions, grants, licenses, easements, variances, exemptions, consents, orders, franchises, authorizations and approvals of all Governmental Authorities necessary for the lawful conduct of the Business.  Seller has not received any written notice or other written communication from any Governmental Authority or other Person (i) asserting any material violation of, or failure to materially comply with, any requirement of any Permit or (ii) notifying Seller of the non-renewal, revocation or withdrawal of any Permit.   Seller is in compliance in all material respects with the terms of the Permits.

4.17    Tax Matters.

(a)    Except as set forth on Schedule 4.17(a), to Seller's Knowledge, Seller has paid all Taxes, including all installments on account of Taxes for the current year, that are due and payable by it.

(b)    Except as set forth on Schedule 4.17(b), there are no proceedings, investigations, audits or claims now pending or, to Seller's Knowledge, threatened against Seller in respect of any Taxes, and there are no matters under discussion, audit or appeal with any Governmental Authority relating to Taxes, which will result in an Encumbrance on the Acquired Assets.

(c)    To Seller's Knowledge, Seller has duly and timely withheld all Taxes and other amounts required by Law to be withheld by it (including Taxes and other amounts required to be withheld by it in respect of any amount paid or credited or deemed to be paid or credited by it to or for the account or benefit of any Person, including any employees, officers or directors and any non-resident Person), and has duly and timely remitted to the appropriate Governmental Authority such Taxes and other amounts required by Law to be remitted by it.

(d)    To Seller's Knowledge, Seller has duly and timely collected all amounts on account of any sales or transfer taxes, including goods and services required by Law to be collected by it and has duly and timely remitted to the appropriate Governmental Authority any such amounts required by Law to be remitted by it.

4.18    Inventories.  The Inventories Cost of the rental equipment Inventories is no less than Twelve Million Six Hundred Thousand Dollars ($12,600,000) in accordance with Seller's Rental Inventory Report set forth in Schedule 4.4(b), based on a physical inventory count to be conducted by an independent third-party firm engaged by Purchaser on or prior to the Closing. To Seller's Knowledge, since August 1, 2015, no Inventories or other Acquired Assets have been sold, disposed of or otherwise transferred by Seller outside the ordinary course of business.

4.19    Warranties Are Exclusive.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH

Exh 2_026

OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as of the Execution Date and as of the Closing Date as follows:

5.1     Due Organization.  Purchaser is a limited liability company duly organized and validly existing under the Laws of the Commonwealth of Pennsylvania and has all requisite limited liability company power and authority to own its properties and assets and to conduct its business as now conducted.

5.2     Authorization and Validity.  Purchaser has all necessary limited liability company power and authority to execute and deliver this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and the performance of Purchaser's obligations hereunder and thereunder have been, or at the time of execution will be, duly authorized by all necessary action by the members and managers of Purchaser, and no other limited liability company proceedings on the part of Purchaser are necessary to authorize such execution, delivery and performance. This Agreement and each Ancillary Agreement to which Purchaser is or will become a party have been, or at the time of execution will be, duly executed and delivered by Purchaser and constitute, or will constitute, when executed and delivered, Purchaser's valid and binding obligations, enforceable against it in accordance with their respective terms except as may be limited by bankruptcy or other Laws affecting creditors' rights and by equitable principles.

5.3     No Conflict or Violation.  The execution, delivery and performance by Purchaser of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party do not or will not at the time of execution (a) violate or conflict with any provision of the organizational documents of Purchaser, (b) violate any provision of applicable Law, or any order, writ, injunction, judgment or decree of any court or Governmental Authority applicable to Purchaser or (c) violate or result in a breach of or constitute (with due notice or lapse of time, or both) an event of default or default under any Contract to which Purchaser is a party or by which Purchaser is bound or to which any of Purchaser's properties or assets are subject.

5.4     Consents and Approvals.  Except for the approval the Bankruptcy Court, no consent, waiver, authorization or approval of any Person and no declaration to or filing or registration with any Governmental Authority is required in connection with the execution and delivery by Purchaser of this Agreement and each Ancillary Agreement to which Purchaser is or will become a party or the performance by Purchaser of its obligations hereunder or thereunder.

5.5     No Physical Count.  Purchaser acknowledges that no physical count of the Inventories or FF&E has been performed by Seller except for cycle counts that were provided to Purchaser as part of its due diligence.  Purchaser requested that, on or prior to the Closing, an

Exh 2_027

independent third-party firm hired by Purchaser conduct a physical inventory count of the rental equipment Inventories, including parts and accessories. Purchaser otherwise has conducted its own due diligence investigation of the Acquired Assets, including the Inventories and the FF&E. Seller is, or by Closing will be, satisfied with such physical inventory by such firm and Purchaser's due diligence investigation of the Acquired Assets. Notwithstanding the foregoing, nothing herein limits any representation made by Seller and Purchaser does not waive any rights that Purchaser has hereunder.

5.6     No Brokers or Finders.    No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Purchaser in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

5.7     Litigation.    There is no Action pending or, to Purchaser's knowledge, threatened in any court or by or before any Governmental Authority that would adversely affect Purchaser's ability to perform its obligations under this Agreement on a timely basis.

5.8     No Other Representations and Warranties.    Except for the representations and warranties contained in this Article 5, neither Purchaser nor any other Person makes any other express or implied representation or warranty on behalf of Purchaser.

## ARTICLE 6
## COVENANTS AND OTHER AGREEMENTS

6.1     Pre-Closing Covenants of Seller.    Seller covenants with Purchaser that, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)     Cooperation. Seller shall, without the requirement of payment of funds to counterparties, use commercially reasonable efforts to obtain, and assist Purchaser in obtaining, at no cost to Purchaser (other than Cure Amounts payable at or after the Closing), such consents, waivers or approvals of any third party or Governmental Authority, including the Bankruptcy Court, required for the consummation of the transactions contemplated hereby, including the sale and assignment of the Acquired Assets. Seller shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b)     Access to Records and Properties.    Seller shall, subject to the terms of the existing confidentiality agreement between Seller and Purchaser, (i) provide Purchaser and its Related Persons reasonable access during normal business hours upon reasonable notice to the facilities, offices and personnel of Seller and to the books and records of Seller; (ii) furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations of Seller as Purchaser shall reasonably request; and (iii) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; provided, however, that Purchaser shall

Exh 2_028

use commercially reasonable efforts to prevent any such inspection from unreasonably interfering with the operation of the Business or the duties of any employee of Seller.

(c)    Conduct of Business Prior to Closing. Except as expressly contemplated by this Agreement, and except to the extent expressly required under the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court:

(i)    without Purchaser's prior written consent, Seller shall not directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Acquired Assets other than the sale of inventory in the ordinary course of business or the use of cash collateral in accordance with the DIP Orders;

(ii)    without Purchaser's prior written consent, Seller shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Exceptions and Permitted Liens;

(iii)    without Purchaser's prior written consent, Seller shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a breach of any representation or warranty made by Seller in this Agreement;

(iv)    Seller shall notify Purchaser promptly in writing of any Material Adverse Effect;

(v)    without Purchaser's prior written consent, Seller shall not make any promise or representation, oral or written, or otherwise, (x) to increase the annual level of compensation payable or to become payable by Seller to any of its directors or Business Employees, (y) to grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director or Business Employee, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (z) to enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller is a party or involving a director or Business Employee of Seller, except, in each case, as required by Law, or as required by any plans, programs or agreements existing on the Execution Date;

(vi)    Seller shall comply in all material respects with all Laws applicable to it or having jurisdiction over the Business or any Acquired Asset;

(vii)    without Purchaser's prior written consent, Seller shall not enter into any lease or other Contract material to Seller outside the ordinary course of business or assume, amend, modify or terminate any lease or other Contract to which Seller is a party or by which it is bound (including any Assigned Contract);

(viii)    without Purchaser's prior written consent, Seller shall not cancel or compromise any material debt or claim or waive or release any right of Seller that constitutes an Acquired Asset;

(ix)    without Purchaser's prior written consent, Seller shall not enter into any commitment for capital expenditures;

(x)    Seller shall use commercially reasonable efforts to (1) conduct the Business in substantially the same manner as conducted as of the Execution Date and only in the ordinary course, (2) preserve the existing business organization and management of the Business intact, (3) keep available the services of the current officers and employees of the Business, (4) maintain existing relations with customers, distributors, suppliers, creditors, business partners, employees and others having business dealings with the Business, and (5) refrain from changing in any material respect any of its prices or pricing policies (*e.g.*, discount policies), except as shall be necessary to meet competition or customer requirements;

(xi)    Seller shall at all times maintain, preserve and protect all of its Intellectual Property, and preserve all the remainder of its material property, in use or useful in the conduct of the Business and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices, so that the business carried on in connection therewith may be properly and advantageously conducted at all times; and

(xii)    Seller shall not take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

(xiii)    Seller shall cooperate with Purchaser to permit a physical inventory by an independent third-party firm engaged by Purchaser of rental equipment Inventories to take place as close as practicable to (but prior to) Closing.

6.2    <u>Pre-Closing Covenants of Purchaser</u>.  Purchaser covenants with Seller that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement:

(a)    <u>Cooperation</u>. Purchaser shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby; provided, that the foregoing shall not require Purchaser to participate in the Auction.

(b)    <u>Adequate Assurances Regarding Assigned Contracts and Required Orders</u>. With respect to each Assigned Contract, Purchaser shall use its commercially reasonable efforts to provide adequate assurance of the future performance of such Assigned Contract by Purchaser. Purchaser shall take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of the Bankruptcy Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(c)    <u>Permits</u>. Purchaser shall use commercially reasonable efforts to cooperate with Seller to obtain or consummate the transfer to Purchaser of any Permit required to own or operate the Acquired Assets under applicable Laws.

Exh 2_030

6.3     <u>Other Covenants of Seller and Purchaser</u>.

(a)     <u>Disclosure Schedules and Supplements</u>. Seller shall supplement or amend the disclosure schedules (the "<u>Schedules</u>") to this Agreement with respect to any matter that (i) arises after the Execution Date and that, if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement or (ii) makes it necessary to correct any information in the Schedules to this Agreement or in any representation and warranty of Seller that has been rendered inaccurate thereby. Each such notification and supplementation, to the extent known, shall be made no later than two (2) Business Days after discovery thereof and no later than three (3) days before the Closing Date. No such supplement or amendment to the Schedules to this Agreement shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement. Purchaser shall have the right to terminate this Agreement by written notice to Seller within three (3) Business Days after receipt of any new, supplemented or amended Schedule delivered pursuant to this Section if such Schedule is not satisfactory to Purchaser.

(b)     <u>Personally Identifiable Information</u>.  Purchaser shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of Seller in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

(c)     <u>Access to Records after Closing</u>.  Following the Closing, Purchaser and Seller agree to permit their respective representatives to have access, at, reasonable times and in a manner so as not to unreasonably interfere with their normal business operations, to the books and records acquired pursuant to this Agreement so as to enable Purchaser and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal actions or for other like purposes. If either party desires to dispose of any such records, such party shall, prior to such disposition, provide the other party with a reasonable opportunity to remove such of the records to be disposed of at the removing party's expense.

6.4     <u>Employment Covenants and other Undertakings</u>.

(a)     <u>Employees</u>.  Purchaser shall offer employment to all of the Business Employees on such terms as Purchaser determines are reasonable, provided that, with respect to Business Employees who are subject to employment agreements that are Assigned Contracts ("<u>Employment Agreements</u>"), Purchaser shall offer employment on terms consistent with the applicable Employment Agreement.  <u>Schedule 6.4(a)</u> sets forth a complete list, as of the Execution Date, of all such Employment Agreements which Purchaser shall assume pursuant to the assignment provisions thereof.  Any Business Employees actually employed by Purchaser are referred to herein as "<u>Transferred Employees</u>." Seller shall deliver to Purchaser on or before the Closing Date all personnel files and employment records relating to the Transferred Employees (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such employees as Seller certifies in writing are exempt from such requirement).

(b)    <u>Purchaser Employee Benefit Plans</u>. At Closing, Purchaser shall provide, or shall cause to be provided, for the benefit of the Transferred Employees and their beneficiaries and dependents, employee benefits that are generally comparable to those provided to Purchaser's Employees immediately prior to Closing.  For all purposes under the Employee Benefit Plans of Purchaser, whether now existing or hereafter adopted ("<u>Purchaser Plans</u>"), to the extent permitted by the applicable Purchaser Plans and applicable Law, Purchaser shall credit (i) each Transferred Employee with his or her service with Seller, to the same extent such service would have been credited had such service been with Purchaser, and (ii) the Transferred Employees with all service recognized by Seller under employee plans as service with Purchaser for purposes of eligibility to participate and vesting under all Employee Benefit Plans, programs and policies of Purchaser. To the extent permitted by the applicable Purchaser Plans and applicable Law, Purchaser shall waive any coverage waiting period, pre-existing condition and actively-at-work requirements that have been satisfied under corresponding plans of Seller and shall provide that any eligible expenses incurred before the Closing Date by a Transferred Employee (and his or her beneficiaries or dependents) or Seller during the calendar year of the Closing and disclosed to Purchaser by such Transferred Employee shall be taken into account for purposes of satisfying the applicable deductible, coinsurance and maximum out-of-pocket provisions, and applicable annual and/or lifetime maximum benefit limitations of Purchaser Plans.

(c)    <u>Seller's Employee Benefit Plans</u>. Unless Purchaser, in its sole discretion, elects on or after the Closing, to adopt any of Employee Benefit Plans, Seller shall retain (i) all liabilities and obligations in respect of its past, present and future employees under applicable Laws and (ii) all liabilities and obligations under any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other Employee Benefit Plan maintained or contributed to by Seller or any ERISA Affiliate, including any Employee Benefit Plans, and Purchaser shall have no liability or obligation whatsoever under the Employee Benefit Plans nor shall Purchaser assume the sponsorship of the Employee Benefit Plans.

(d)    <u>Other Obligations</u>. Except as provided in any Assigned Contract or as otherwise required by Law, specified in this Agreement, or otherwise agreed in writing by Purchaser and/or its Affiliates, neither Purchaser nor its Affiliates shall be obligated to provide any severance, separation pay, or other payments or benefits, including any key employee retention payments, to any employee of Seller on account of any termination of such employee's employment on or before the Closing Date, and such benefits (if any) shall remain obligations of Seller.

(e)    <u>Employee Communications</u>. Prior to making any written or oral communications to the Business Employees pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, Seller shall provide Purchaser with a copy of the intended communication.

6.5    <u>Non-Assignment of Contracts</u>.    Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Assigned Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of any other Person party thereto, would constitute a breach thereof or in any way negatively affect the rights of

Exh 2_032

Purchaser (unless the restrictions on assignment would be rendered ineffective pursuant to Sections 9-406 through 9-409, inclusive, of the Uniform Commercial Code, as amended), as the assignee of such Assigned Contract or Permit, as the case may be, thereunder. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, neither Seller nor Purchaser shall be in breach of this Agreement nor shall the Purchase Price be adjusted or the Closing delayed, provided that Seller shall cooperate with Purchaser without further consideration, in any reasonable arrangement designed to provide Purchaser with all of the benefits of or under any such Assigned Contract or Permit, including, but not limited to, enforcement for the benefit of Purchaser of any and all rights of Seller against any Person party to the Assigned Contract or Permit arising out of the breach or cancellation thereof by such Person; provided, however, that after Closing, Purchaser shall be responsible for all payment and other obligations under, and for all costs of enforcing rights under, such Assigned Contract or Permit to the same extent as if such Assigned Contract or Permit had been assigned. Any assignment to Purchaser of any Assigned Contract or Permit that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained. For the avoidance of doubt, nothing in this Section 6.5 shall be deemed to alter any rights of Purchaser under Section 11.1(c)(vii) of this Agreement.

6.6    Casualty.  If between the Execution Date and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("Casualty"), then Purchaser shall have the option to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from the applicable Seller of all insurance proceeds payable to Seller in respect of the Casualty, or (b) in the event that the Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

6.7    Name Change; Use of Name.  For the six (6)-month period after the Closing (the "Name Usage Period"), Seller shall use the trade names "DigitalSound Production Services" and "DPS" only in connection with the winding down and dissolution of Seller and shall not use such trade names in connection with any business operations.  Notwithstanding, promptly after the expiration of the Name Usage Period, Seller shall deliver to Purchaser a duly and properly authorized and executed evidence (in form and substance satisfactory to Purchaser) as to the amendment of Seller's organizational documents (the "Organizational Amendments") changing Seller's name to another name that does not include one or more of "Digital", "Production", "Services", "DPS" or any similar words.  At such time, Purchaser shall have the authority to file the Organizational Amendments in the appropriate offices of each applicable jurisdiction. Furthermore, after the expiration of the Name Usage Period, Seller shall discontinue all use of its current name (and any other trade names currently utilized by Seller) and shall not subsequently change its name to or otherwise use or employ any name that includes one or more of "Digital," "Production," "Services," "DPS" or any similar name without the prior written consent of Purchaser. From and after the expiration of the Name Usage Period, Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, dba's or similar Intellectual Property rights utilized by Seller in the conduct of the Business, which rights are included in the Acquired Assets purchased hereunder.  After the expiration of the Name Usage

Exh 2_033

Period, Seller shall only be entitled to use the trade names "DigitalSound Productions Services" and "DPS" to indicate that Seller formerly conducted business under those names.

## ARTICLE 7
## TAXES AND BULK SALE LAWS

7.1    <u>Taxes Related to Purchase of Acquired Assets</u>.    All sales and transfer taxes, including all state, municipal and local Taxes in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "<u>Transaction Taxes</u>"), that are imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets shall be paid by Purchaser.    Purchaser and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

7.2    <u>Waiver of Bulk Sales Laws</u>.    To the greatest extent permitted by applicable Law, Purchaser and Seller hereby waive compliance by Purchaser and Seller with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. Seller shall indemnify Purchaser from and hold Purchaser harmless from and against any liabilities, damages, costs and expenses (including reasonable attorneys' fees) resulting from or arising out of (i) the parties' failure to comply with any such bulk sales Laws in respect of the transactions contemplated by this Agreement or (ii) any action brought or levy made as a result thereof. The Bankruptcy Sale Order shall exempt Seller and Purchaser from compliance with any such Laws.

## ARTICLE 8
## BANKRUPTCY COURT MATTERS

8.1    <u>Motions</u>.    Seller shall file with the Bankruptcy Court, within two (2) Business Days after the Petition Date, the Bidding Procedures and Sale Motion.    Seller shall affix a true and complete copy of this Agreement to the Bidding Procedures and Sale Motion filed with the Bankruptcy Court. The Bidding Procedures and Sale Motion shall request, among other things, pursuant to, inter alia, Bankruptcy Code Sections 105, 363(b), (f), (k), (m) and (n), 365 and Local Bankruptcy Rules 2002, 6004, 6006 and 9014 (i) the scheduling of the date for the Auction to be commenced no later than twenty-five (25) days after the Petition Date, and the Sale Hearing not more than two (2) Business Days following the completion of the Auction, (ii) the entry of the Bidding Procedures Order in all material respects on the terms set forth in <u>Exhibit B</u> by no later than ten (10) days after the Petition Date, and (iii) the entry of the Bankruptcy Sale Order in all material respects on the terms set forth in <u>Exhibit A</u> by no later than thirty (30) days after the Petition Date.

8.2    <u>Assigned Contracts</u>.    Seller shall serve on all counterparties to those Contracts that may be designated as Assigned Contracts pursuant to <u>Section 2.5</u> a notice specifically stating that Seller is or may be seeking the assumption and assignment of the Assigned Contracts and shall notify such parties of the deadline for objecting to the Cure Amounts, which deadline shall not be less than five (5) days prior to the Auction. In cases in which Seller is unable to establish

Exh 2_034

that a default exists, the relevant cure amount shall be set at $0.00.  The Bidding Procedures and Sale Motion shall reflect Purchaser's agreement to perform from and after the Closing under the Assigned Contracts, which, subject to Court approval, shall be the only adequate assurance of future performance necessary to satisfy the requirements of Section 365 of the Bankruptcy Code in respect of the assignment to Purchaser of such Assigned Contracts.

8.3     Procedure.  To the extent practicable under the circumstances, Seller shall provide Purchaser with drafts of any and all material pleadings and proposed orders to be filed or submitted in connection with this Agreement for Purchaser's prior review and, if time permits, comment and shall cooperate with Purchaser to make reasonable changes.   Seller agrees to diligently prosecute the entry of the Bankruptcy Sale Order. In the event the entry of the Bankruptcy Sale Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal. Notwithstanding the foregoing, any resulting material changes to this Agreement or any Ancillary Agreement or any resulting material changes to the Orders shall be subject to Purchaser's approval in its sole discretion, and any resulting non-material changes to the Agreement, Ancillary Agreement or Orders shall be subject to Purchaser's approval in its reasonable discretion.

8.4     Purchaser Protections.   Seller shall pay to Purchaser the Break-up Fee and Expense Reimbursement, if required, pursuant to the terms and conditions set forth in Section 11.3.

**ARTICLE 9**
**CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES**

9.1     Conditions Precedent to the Performance by Seller.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the condition contained in Section 9.1(d)) may be waived by Seller, in its sole discretion:

(a)     Representations and Warranties of Purchaser. The representations and warranties of Purchaser made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct, and the representations and warranties of Purchaser made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects.

(b)     Performance of the Obligations of Purchaser. Purchaser shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is a party that are to be performed by it on or before the Closing Date (except with respect to (i) the obligation to pay the Purchase Price in accordance with the terms of this Agreement and (ii) any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement).

(c)     Bankruptcy Court Approval. The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay.

**Exh 2_035**

(d)  <u>No Violation of Orders</u>. No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)  <u>Bidding Procedures Order</u>. The Bidding Procedures Order shall have been entered in the Bankruptcy Case.

(f)  <u>Assumption, Sale and Assignment of Contracts</u>.  Subject to <u>Section 6.5</u>, the Assignable Contracts designated hereunder as Assigned Contracts shall be so assumed, sold and assigned to Purchaser by order of the Bankruptcy Court.

(g)  <u>Proof of Funds</u>.  Purchaser shall have delivered to Seller Purchaser's proof of funds sufficient, in Seller's reasonable determination, to demonstrate Purchaser's ability to finance and otherwise close the transactions contemplated hereby.

(h)  <u>Pacoima Landlord's Consent</u>.  Purchaser shall have delivered to Seller a landlord's consent, executed by the landlord, consenting to the assignment of the Pacoima Lease to Purchaser (or alternatively, a fully executed new lease between Purchaser and such landlord replacing the Pacoima Lease), in either case including a release of Seller from liability under the Pacoima Lease.

For avoidance of doubt, there shall be no conditions precedent to Seller's obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this <u>Section 9.1</u>.

9.2  <u>Conditions Precedent to the Performance by Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in <u>Section 9.2(c)</u> and <u>Section 9.2(d)</u>, except as expressly provided therein) may be waived by Purchaser, in its sole discretion:

(a)  <u>Representations and Warranties of Seller</u>. The representations and warranties of Seller made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct, and the representations and warranties of Seller made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects.

(b)  <u>Performance of the Obligations of Seller</u>.  Seller shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is a party that are to be performed by it on or before the Closing Date (except with respect to any obligations qualified by materiality, which, obligations shall be performed in all respects as required under this Agreement).

(c)  <u>Bankruptcy Court Approval</u>. The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay and the Bankruptcy Court shall have provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement. The Bankruptcy Sale Order shall have become a final and

**Exh 2_036**

nonappealable order, unless this condition has been waived in writing by Purchaser in its sole discretion.

(d)   <u>No Violation of Orders</u>. No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)   <u>Bidding Procedures and Sale Motion</u>. On or prior to the second (2nd) day after the Petition Date, the Bidding Procedures and Sale Motion shall have been filed in the Bankruptcy Case.

(f)   <u>Bidding Procedures Order</u>. On or prior to the tenth (10th) day after the Petition Date, the Bidding Procedures Order shall have been entered in the Bankruptcy Case.

(g)   <u>Bankruptcy Sale Order</u>. On or prior to the thirtieth (30th) day after the Petition Date, the Bankruptcy Sale Order shall have been entered in the Bankruptcy Case.

(h)   <u>Assumption, Sale and Assignment of Contracts</u>.  Subject to <u>Section 6.5</u>, the Assignable Contracts designated hereunder as Assigned Contracts shall be so assumed, sold and assigned to Purchaser by order of the Bankruptcy Court reasonably satisfactory to Purchaser.

(i)   <u>Vehicles</u>.  Seller shall have executed and delivered duly endorsed certificates of title for any items of the FF&E for which registration is required with the Department of Motor Vehicles ("<u>DMV</u>") along with any other DMV forms necessary to transfer such items of FF&E to Purchaser (collectively, "<u>DMV Documents</u>").

For avoidance of doubt, there shall be no conditions precedent to Purchaser's obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this <u>Section 9.2</u>.

## ARTICLE 10
## CLOSING AND DELIVERIES

10.1   <u>Closing</u>.  The consummation and effectuation of the transactions contemplated hereby pursuant to the terms and conditions of this Agreement (the "<u>Closing</u>") shall be held two (2) Business Days after the date that all conditions to the parties' obligations to consummate the transactions contemplated herein have been satisfied, but not earlier than ten (10) days after the Bankruptcy Sale Order shall have become final and non-appealable  (the "<u>Closing Date</u>") (except for closing conditions that by their terms can only be satisfied on the Closing Date) or, if applicable, waived by the appropriate party or parties, at 10:00 a.m., local time, in the offices of Cozen O'Connor, 1650 Market Street, 28th Floor, Philadelphia, PA 19103, or on such other date or at such other place and time as may be mutually agreed to in writing by the parties. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

Exh 2_037

10.2   <u>Seller's Deliveries</u>.  At the Closing,

(a)   the sale, transfer, assignment, conveyance and delivery by Seller of the Acquired Assets to Purchaser shall be effected by the execution and delivery by Seller of (i) the Assignment and Assumption Agreement, (ii) the Domain Name Assignment; (iii) the DMV Documents; and (iv) such special or limited warranty deeds, additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance reasonably satisfactory in form and substance to Purchaser;

(b)   Seller shall execute and deliver to Purchaser, to the extent reasonably required by Purchaser, any Ancillary Agreements;

(c)   Seller shall deliver an officer's certificate, duly executed by a senior officer of Seller, certifying the matters set forth in <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u>, in form and substance satisfactory to Purchaser;

(d)   Seller shall deliver a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price;

(e)   Seller shall deliver possession of the Acquired Assets and take all actions necessary to effect the transfer of the DPSinc.com website; and

(f)   Seller shall deliver a certified copy of the Bankruptcy Sale Order.

10.3   <u>Purchaser's Deliveries</u>.  At the Closing,

(a)   Purchaser shall make the cash payments specified in <u>Section 3.1(b)</u>;

(b)   Purchaser shall execute and deliver to Seller the Assignment and Assumption Agreement, including, with respect to, the Employment Agreements;

(c)   Purchaser shall execute and deliver to Seller the Domain Name Assignment;

(d)   Purchaser shall execute and deliver to Seller, to the extent reasonably required by Seller, any Ancillary Agreements; and

(e)   Purchaser shall deliver an officer's certificate, duly executed by a senior officer of Purchaser, certifying the matters set forth in <u>Section 9.1(a)</u> and <u>Section 9.1(b)</u>, in form and substance satisfactory to Seller.

## ARTICLE 11
## TERMINATION

11.1   <u>Conditions of Termination</u>.   This Agreement may be terminated only in accordance with this <u>Section 11.1</u>. This Agreement may be terminated at any time before the Closing as follows:

Exh 2_038

(a)    by mutual written consent of Seller and Purchaser;

(b)    automatically and without any action or notice by either Seller to Purchaser, or Purchaser to Seller, immediately upon:

(i)    the issuance of a final and nonappealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Acquired Assets contemplated hereby;

(ii)    approval by the Bankruptcy Court of an Alternate Transaction;

(iii)    acceptance by Seller of an Alternate Transaction; or

(iv)    Purchaser not being declared the winning bidder upon completion of the Auction.

(c)    by Purchaser:

(i)    if the Bidding Procedures Order shall not have been entered by the eleventh (11th) day after the Petition Date (or such later date as Purchaser may have designated in writing to Seller);

(ii)    if the Auction has not concluded by twenty-sixth (26th) day after the Petition Date (or such later date as Purchaser may have designated in writing to Seller);

(iii)    if the Bankruptcy Court has not entered the Bankruptcy Sale Order by thirty-first (31st) day after the Petition Date (or such later date as Purchaser may have designated in writing to Seller);

(iv)    if there has been a violation or breach by Seller of any material representation, warranty or covenant contained in this Agreement that (x) has rendered the satisfaction of any condition to the obligations of Purchaser impossible or not curable or, if curable, has not been cured within five (5) Business Days following receipt by Seller of written notice of such breach from Purchaser, and (y) has not been waived by Purchaser;

(v)    at any time after the sixtieth (60th) day after the Petition Date, if the Closing shall not have occurred and such failure to close is not caused by or the result of Purchaser's breach of this Agreement;

(vi)    if, prior to the Closing Date, Seller's Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case;

(vii)    if there shall be excluded from the Acquired Assets any Assigned Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing and such Assigned Contract shall, in the opinion of Purchaser in

Exh 2_039

its absolute discretion, prevent it from effectively operating the Business; provided, however, the foregoing shall not apply to Employment Agreements; or

(viii)   if Purchaser so elects in writing pursuant to <u>Section 6.3</u> or <u>Section 6.6</u>.

(d)   by Seller:

(i)   if there has been a violation or breach by Purchaser of any material representation or warranty contained in this Agreement that (x) has rendered the satisfaction of any condition to the obligations of Seller impossible or is not curable or, if curable, has not been cured within five (5) days following receipt by Purchaser of written notice of such breach from Seller, and (y) has not been waived by Seller; or

(ii)   at any time after the earlier of (A) January 5, 2016 if the Bankruptcy Sale Order is entered on or before December 31, 2015 (or, if the Bankruptcy Sale Order is entered at a later date, five (5) Business Days after the Bankruptcy Sale Order is entered), or (B) the ninetieth (90th) day after the Petition Date, if the Closing shall not have occurred and such failure to close is not caused by or the result of Seller's breach of this Agreement.

11.2   <u>Effect of Termination</u>.  In the event of termination pursuant to <u>Section 11.1</u>, this Agreement shall become null and void and have no effect and neither party shall have any liability to the other (other than those provisions of <u>Article 11</u> and <u>Article 12</u> that expressly survive termination or obligations to be performed on or after the Closing) and each party shall be liable to the other after the Closing for any prior breach hereof).

11.3   <u>Break-up Fee and Expense Reimbursement</u>.

(a)   If this Agreement is terminated pursuant to (x) <u>Section 11.1(c)(i)</u>, <u>Section 11.1(c)(ii)</u>, <u>Section 11.1(c)(iii)</u>, <u>Section 11.1(c)(iv)</u>, <u>Section 11.1(c)(v)</u>, or <u>Section 11(c)(vi)</u>, solely if the event specified in such applicable Section occurs as a direct result of Seller's actions or inactions, or (y) <u>Section 11.1(b)</u>, <u>Section 11.1(c)(vii)</u> or <u>Section 11.1(c)(viii)</u>, Purchaser shall be deemed to have earned the Break-up Fee and Expense Reimbursement. The Break-up Fee and Expense Reimbursement shall be super-priority administrative expense priority obligations under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject to any super-priority Claims of Seller's post-petition lenders.

(b)   Purchaser shall have no right to the Break-up Fee and Expense Reimbursement if this Agreement is terminated pursuant to <u>Section 11 .1(a)</u> or <u>Section 11.1(d)</u>.

(c)   The Break-up Fee and Expense Reimbursement shall be paid in cash, without further order of the Bankruptcy Court, immediately upon the occurrence of any event resulting in the Break-up Fee and Expense Reimbursement being earned pursuant to <u>Section 11.3(a)</u>.

Exh 2_040

(d)     Seller hereby acknowledges that the obligation to pay the Break-up Fee and Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement.

# ARTICLE 12
# INDEMNIFICATION

12.1    <u>Indemnification of Purchaser</u>.  Seller covenants and agrees that it will indemnify and hold harmless Purchaser and its managers, shareholders, members, employees, directors, officers and agents and its successors and assigns (collectively, the "<u>Indemnitees</u>") from and after the Closing Date, against any and all losses, damages, assessments, fines, penalties, adjustments, liabilities, claims, deficiencies, costs and expenses (including, specifically, reasonable attorneys' fees, court costs, witness fees and expenses of investigation) (collectively, "<u>Damages</u>") incurred by any Purchaser Indemnitee with respect to each of the following contingencies (each, an "<u>Indemnity Event</u>"):

(a)     Any misrepresentation or breach of warranty on the part of Seller pursuant to the terms of this Agreement;

(b)     Any nonfulfillment of any agreement or covenant on the part of Seller pursuant to the terms of this Agreement;

(c)     Any liability based on, attributable to or resulting from the Acquired Assets or Assumed Liabilities arising on or before the Closing; and

(d)     Any liability based on, attributable to or resulting from the Excluded Assets or Excluded Liabilities, whether arising prior to, on or after the Closing or in connection with the consummation of the transactions contemplated hereby; and

(e)     Any actions, suits, arbitrations, proceedings, demands, assessments, adjustments, costs and expenses (including, specifically, reasonable attorneys' fees and expenses of investigation) incident to any of the foregoing.

12.2    <u>Indemnification of Seller</u>.  Purchaser covenants and agrees that it will indemnify and hold harmless Seller and its Indemnitees from and after the Closing Date, against any and all Damages incurred by any Purchaser Indemnitee with respect to each of the following Indemnity Events:

(a)     Any misrepresentation or breach of warranty on the part of Purchaser pursuant to the terms of this Agreement;

(b)     Any nonfulfillment of any agreement or covenant on the part of Purchaser pursuant to the terms of this Agreement;

(c)     Any liability to Seller arising from the Allocation Statement delivered by Purchaser being in violation of applicable Law;

(d)     Any liability based on, attributable to or resulting from the Acquired Assets or Assumed Liabilities arising after the Closing; and

(e)     Any actions, suits, arbitrations, proceedings, demands, assessments, adjustments, costs and expenses (including, specifically, reasonable attorneys' fees and expenses of investigation) incident to any of the foregoing.

12.3     <u>Limitations on Seller and Purchaser Indemnities</u>.

(a)     Notwithstanding anything contained in this Agreement to the contrary, for purposes of determining the amount of Damages with respect to any and all Indemnity Events (but not for purposes of determining whether a breach of a representation or warranty has occurred), each representation and warranty in this Agreement shall be read without giving effect to the terms "material," or "Material Adverse Effect," or words of similar import.

(b)     Absent fraud, Seller's liability for Damages shall be satisfied solely by a reduction in the Holdback Amount.

12.4     <u>Notice of Indemnity Claim</u>.

(a)     In the event that any claim ("<u>Indemnity Claim</u>") is hereafter asserted against or arises with respect to any Indemnitee as to which an Indemnitee may be entitled to indemnification hereunder, the Indemnitee shall notify the indemnifying party ("<u>Indemnitor</u>") in writing thereof (the "<u>Claims Notice</u>") within sixty (60) days after (i) receipt of written notice of commencement of any third party litigation against the Indemnitee (a "<u>Third Party Claim</u>"); (ii) receipt by the Indemnitee of written notice of any Third Party Claim pursuant to an invoice, notice of claim or assessment against the Indemnitee; or (iii) the Indemnitee becomes aware of the existence of any other event in respect of which indemnification may be sought from Indemnitor (including any inaccuracy of any representation or warranty or breach of any covenant).  The Claims Notice shall describe the Indemnity Claim and the specific facts and circumstances in reasonable detail, and shall indicate the amount, if known, or an estimate, if possible, of the losses that have been or may be incurred or suffered by the Indemnitee. The failure to timely deliver a Claims Notice or otherwise notify Indemnitor of the commencement of such actions in accordance with this <u>Section 12.4</u> shall not relieve Indemnitor from the obligation to indemnify hereunder except to the extent that Indemnitor establishes by competent evidence that it has been prejudiced thereby.

(b)     Indemnitor shall have the right to assume, at Indemnitor's expense, the defense of any Third Party Claim with counsel of its choosing, provided that such counsel is reasonably acceptable to Indemnitee; provided further that, if Indemnitor does not give written notification to Indemnitee of Indemnitor's agreement to assume the defense of a Third Party Claim within ten (10) days after the applicable Claims Notice is delivered, or if Purchaser (if it is Indemnitee) reasonably concludes that the amount in controversy exceeds the then remaining Holdback Amount, Purchaser (as Indemnitee) may assume the defense of the Third Party Claim with counsel of its own choosing.  Whichever party controls the defense of a Third Party Claim is referred to as the "<u>Controlling Party</u>" and the other party is referred to as the "<u>Non-Controlling</u>

Party."   The Non-Controlling Party may participate but not control, at the Non-Controlling Party's own expense, in the defense of any such Claim assumed by the Controlling Party.

(c)   The Controlling Party shall keep the Non-Controlling Party reasonably informed at all times of the progress and development of its defense of and compromise efforts with respect to any Indemnity Claim and shall furnish such party with copies of all relevant pleadings, correspondence and other papers.   In addition, the parties to this Agreement shall cooperate with each other and make available to each other and their representatives all available relevant records or other materials required by them for their use in defending, compromising or contesting any Indemnity Claim.

(d)   The Controlling Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior consent of the Non-Controlling Party (which consent shall not be unreasonably withheld or delayed); provided that, if Indemnitee is the Controlling Party, the consent of Indemnitor shall not be required if the judgment or proposed settlement (i) does not result in any monetary liability to Seller (if it is Indemnitor) other than a reduction or elimination of the Holdback Amount, and (ii) does not impose an injunction or other equitable relief on Indemnitor.

(e)   In the event both the Indemnitee and Indemnitor are named as defendants in an action or proceeding initiated by a third party, they shall both be represented by the same counsel (on whom they shall agree), unless the Indemnitee or Indemnitor shall determine that such counsel has a conflict of interest in representing both the Indemnitee and Indemnitor in the same action or proceeding and the Indemnitee and Indemnitor do not waive such conflict to the satisfaction of such counsel.

(f)   Indemnitor hereby consents to the non-exclusive jurisdiction of any court in which a Third Party Claim is brought against any Indemnitee for purposes of any Claim that an Indemnitee may have under this Agreement with respect to such Third Party Claim or the matters alleged therein, and agree that process may be served on Indemnitor.

12.5   Resolution of Direct Claims.   All Indemnity Claims not involving a Third Party Claim (a "Direct Claim") shall be resolved as follows:

(a)   If within thirty (30) days after a written notice of a Claim Notice is received by Indemnitor, Indemnitor does not contest such Claim Notice in writing to Indemnitee, Indemnitor shall be conclusively deemed to have agreed that Damages in the amount specified in the Claim Notice is indemnifiable hereunder.

(b)   If Indemnitor gives Indemnitee written notice contesting all or any portion of a Claim Notice (a "Contested Claim") within the thirty (30)-day period specified in Section 12.5(a), then Indemnitee and Indemnitor will attempt in good faith to resolve such Contested Claim.   If after such thirty (30)-day period the Contested Claim remains unresolved, either Indemnitor or Indemnitee may initiate a proceeding to resolve the dispute.

# ARTICLE 13
# MISCELLANEOUS

13.1    <u>Survival</u>.  The representations and warranties of Seller and Purchaser made in this Agreement shall survive the Closing Date for a period of one (1) year, and the terms of any covenant or agreement of Seller and Purchaser made in this Agreement shall survive indefinitely except as otherwise expressly provided in this Agreement.

13.2    <u>Further Assurances</u>.  At the request and the sole expense of the requesting party, Purchaser or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Purchaser or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

13.3    <u>Successors and Assigns</u>.

(a)    Purchaser shall have the right to assign to an Affiliate any of its rights or obligations in whole or in part (including the right to acquire any of the Acquired Assets) upon the prior written consent of Seller, which shall not be unreasonably withheld; provided that no such consent shall be required if (i) Purchaser assigns its rights to a wholly-owned Affiliate, and (ii) Purchaser retains Purchaser's obligations under this Agreement.

(b)    At or after the Closing, Purchaser shall have the right to assign this Agreement or any of its rights or obligations hereunder as collateral to any lender of Purchaser.

(c)    Except as provided in <u>Section 13.3(a)</u> and <u>Section 13.3(b)</u>, neither party shall have the right to assign this Agreement or any of its rights or obligations hereunder and any such assignment shall be void and of no effect. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto, including any trustee appointed in any of the Bankruptcy Case or subsequent Chapter 7 cases, if the Bankruptcy Case is dismissed.

13.4    <u>Governing Law; Jurisdiction</u>.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of California (without giving effect to the principles of conflicts of laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After such time as Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect to abide by the dispute resolution provisions set forth in <u>Section 13.5</u>.

13.5    <u>Mediation; Arbitration</u>.  After such time as Seller is no longer subject to the jurisdiction of the Bankruptcy Court, any dispute arising out of or in connection with is Agreement shall, at first instance, be referred to a mediator for resolution.  The parties shall agree upon a mediator who has specific experience with business disputes. The parties shall mutually agree upon a mediator within fourteen (14) days and schedule such mediation.  The parties involved shall equally pay their respective portion of the costs of mediation.  Should the mediation fail, in whole or in part, the parties shall submit all disputes not settled in mediation to

Exh 2_044

final and binding arbitration in Los Angeles, California, before a single retired judge under the auspices of JAMS and then current JAMS commercial arbitration rules.  Notwithstanding, the parties adopt and agree to implement the JAMS Optional Arbitration Appeal Procedure (as it exists on the Execution Date) with respect to any final award in an arbitration arising out of or related to this Agreement.  The costs of the arbitration, including any JAMS administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration.  The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement or not available in a court of law, nor shall the arbitrator have power to commit error of law or legal reasoning.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.  The institution and maintenance of an action for judicial relief in pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration.  This provision shall not restrict, however, each party's right to obtain injunctive relief to enforce any provision of this Agreement in any court of competent jurisdiction.

13.6     <u>Expenses</u>.  Except as otherwise provided in this Agreement, each of the parties shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated. Purchaser shall pay the cost of all surveys, title insurance policies and title reports ordered by Purchaser.

13.7     <u>Severability</u>.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date this Agreement was last amended.

13.8     <u>Notices</u>.

(a)     All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (i) on the date of service, if served personally on the party to whom notice is to be given or if served by electronic transmission; (ii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given, if served via Federal Express or similar overnight courier or Express Mail service; or (iii) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:          DigitalSound Production Services, Inc.
                       340 East 1st Street

|                                                      | P.O. Box 1487<br>Tustin, CA 92781<br>Attention: Charles G. Klaus<br>Email: cklaus@sbcglobal.net |
|---|---|
| With a copy (which shall not constitute notice) to:  | Encore Law Group<br>9401 Wilshire Boulevard, Suite 900<br>Beverly Hills, CA 90212<br>Attention: Ara A. Babaian, Esq.<br>Email: ara@encorelaw.com |
| If to Purchaser:                                     | Atomic Lighting LLC<br>425 Front Street<br>Lititz, PA  17543<br>Attention: Brad Clark<br>Email: brad.clark@atomiclighting.tv |
| With a copy (which shall not constitute notice) to:  | Cozen O'Connor<br>1650 Market Street, 28th Floor<br>Philadelphia, PA 19103<br>Attention: Jason M. Shargel, Esq.<br>Email: jshargel@cozen.com |

(b)     Any party may change its address or email address for the purpose of this Section 13.7 by giving the other parties written notice of its new address in the manner set forth above.

13.9    Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Purchaser and Seller, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

13.10   Entire Agreement.  This Agreement and the other Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All Exhibits and Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

13.11   Seller Disclosures.  After notice to and consultation with Purchaser, Seller shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Purchaser in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Case and other Persons

Exh 2_046

bidding on assets of Seller. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Seller shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication with respect to the Agreement or transactions contemplated thereby without the prior written consent of Purchaser, which shall not be unreasonably withheld or delayed; provided, however, that Seller, without the prior consent of Purchaser, may issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law, any Governmental Authority with competent jurisdiction or any listing agreement with any national securities exchange.

13.12   <u>Headings</u>.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

13.13   <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement.  This Agreement may be transmitted electronically, and it is the intent of the parties that the PDF copy of any signature printed by a receiving computer shall be deemed an original signature and shall have the same force and effect as an original signature.

13.14   <u>Construction</u>.  Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" means including without limitation. Any reference to the singular in this Agreement shall also include the plural and vice versa.

13.15   <u>Waiver of Jury Trial</u>.  EACH PARTY HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS TO THE OTHER PARTY THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT 1T MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.

13.16   <u>General Release</u>.  Effective upon the Closing, Seller, on behalf of itself and its estate, acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against Purchaser and any of its Related Persons, that

Exh 2_047

directly or indirectly arise out of, are based upon, or in any manner are connected with the pre-Petition Date agreements to which Purchaser (or its Affiliates) and Seller were parties and all transactions referred to in such agreements (collectively, the "Released Claims").  Should any Released Claims nonetheless exist, Seller, on behalf of itself and its estate, hereby (i) releases and discharges each of Purchaser and its Related Persons from any liability whatsoever on such Released Claims and (ii) releases, waives and discharges all such Released Claims against Purchaser and its Related Persons.

13.17   Force Majeure.  Neither party shall be liable for failures or delays in performance due to causes beyond its reasonable control, including, but not limited to, acts of God or civil or military authority, floods, earthquakes, epidemics, war, riot, destruction of production facilities, strikes or labor stoppages (a "force majeure event").  In the event of any such delay or failure, the party affected shall notify the other party in writing within three days of the occurrence of the force majeure event and shall use all commercially reasonable efforts to overcome the event or circumstance causing the delay or failure as soon as practicable.  The notice to the other party shall indicate the projected length of the force majeure event and the steps that the affected party has taken, or intends to take, to eliminate the cause of such event.

*Signature page follows.*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the Execution Date.

**PURCHASER:**

ATOMIC LIGHTING LLC

By:_____
    Name:  E. Bradley Clark
    Title:  President

**SELLER:**

DIGITALSOUND PRODUCTION SERVICES, INC.

By:_____
    Name:  Charles G. Klaus
    Title:  President

**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

**Exh 2_049**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the Execution Date.

**PURCHASER:**

ATOMIC LIGHTING LLC

By: _____

    Name:  E. Bradley Clark
    Title:  President

**SELLER:**

DIGITALSOUND PRODUCTION
SERVICES, INC.

By: _____

    Name:  Charles G. Klaus
    Title:  President

**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

Exh 2_050

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the Execution Date.

**PURCHASER:**

ATOMIC LIGHTING LLC

By:_____

    Name:  E. Bradley Clark
    Title:  President


**SELLER:**

DIGITALSOUND PRODUCTION
SERVICES, INC.

By:_____

    Name:  Charles G. Klaus
    Title:  President


**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

Exh 2_051

**EXHIBIT A**

**BANKRUPTCY SALE ORDER**

**Exh 2_052**

# EXHIBIT B

# BIDDING PROCEDURES ORDER

**Exh 2_053**

**EXHIBIT C**

**BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

# EXHIBIT D

# DOMAIN NAME ASSIGNMENT

**Exh 2_055**

**EXHIBIT E**

**SAMPLE TRUE UP CALCULATIONS**

| | | | Impact if **A/P exceeds** A/R per Scenario (1) below | | Impact if **A/P lower than** A/R per Scenario (2) below | |
|---|---|---|---|---|---|---|
| | | | A/P Allowance Adj | Adjusted Cash Payments | A/P Allowance Adj | Adjusted Cash Payments |
| Closing Cash Consideration | $3,685,500 | 90% | $ (90,000) | $3,595,500 | $ 90,000 | $ 3,775,500 |
| Cash Holdback (12 mos) | $ 409,500 | 10% | $ (10,000) | $ 399,500 | $ 10,000 | $ 419,500 |
| **TOTAL CASH** | **$4,095,000** | 100% | $ (100,000) | $3,995,000 | $ 100,000 | $ 4,195,000 |

| *Illustration of AP Allowance Impact:* | | |
|---|---|---|
| - | | |
| **Scenario** | (1) | (2) |
| | AP > AR | AP < AR |
| A/R | $ 300,000 | $ 500,000 |
| Trade A/P | $ 800,000 | $ 800,000 |
| Variance | $ (500,000) | $ (300,000) |
| Allowance for excess A/P | $ 400,000 | $ 400,000 |
| Net adjustment | $ (100,000) | $ 100,000 |

RESULTS:    (1) Sales Price is decreased    (2) Sales Price is increased

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION**

In re:

DIGITALSOUND PRODUCTION SERVICES, INC.,

Debtor.

Case No. _____

Chapter 11

**NOTICE OF SALE BY AUCTION, AND OF SALE HEARING**

## NOTICE OF SALE BY AUCTION, AND OF SALE HEARING

**PLEASE TAKE NOTICE** that on December __, 2015, DigitalSound Production Services, Inc., the chapter 11 debtor and debtor in possession (the "**Debtor**"), filed its *Debtor's Notice of and Emergency Motion for (I) An Order (A) Approving Bidding Procedures in Connection with Sale of the Debtor's Assets, (B) Scheduling Hearing to Consider the Sale, and (C) Approving Form and Manner of Notice Thereof; and (II) an Order Authorizing and Approving (A) the Sale of Substantially All of the Debtor's Assets and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases; Memorandum of Points And Authorities* [Doc. # _____] (the "**Bidding Procedures Motion**") with the above-captioned U.S. Bankruptcy Court for the Central District of California, San Fernando Valley Division ("**Bankruptcy Court**") seeking entry of an order, among other things, (a) authorizing and approving bidding and auction in connection with the sale of substantially all of the Debtor's assets, (b) approving certain bid protections in connection with such sale, (c) approving the form and manner of notice of the sale by auction and sale hearing, (d) approving procedures for the assumption and assignment of contracts and leases and noticing of related cure amounts, and (e) scheduling the sale hearing and setting other related dates and deadlines, all as further described in the Bidding Procedures Motion.  Please note that all capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures Motion.

**PLEASE TAKE FURTHER NOTICE** that the Debtor has entered into a sale agreement ("**APA**") with **Atomic Lighting LLC** ("**Stalking Horse Purchaser**") and is soliciting overbid offers for the purchase of substantially all of the Debtor's assets consistent with the bidding procedures ("**Bidding Procedures**") approved by the Bankruptcy Court pursuant to its order entered on December ___, 2015 [Doc. #___] ("**Bidding Procedures Order**").  **The Stalking Horse Purchaser has agreed to buy the Acquired Assets for $5,975,242**, inclusive of $4,095,000 of cash plus $1,880,242 of Assumed Obligations, subject to overbid at Auction upon receipt of at least one Qualified Bid with a **Minimum Overbid Price of $6,230,242**, to better the Stalking Horse APA, inclusive of its purchase price consideration, breakup fee or $122,850, expense reimbursement of up to $75,000, and minimum overbid increment of $57,150.

**TO RECEIVE THE BIDDING PROCEDURES AND SUBMIT A BID**:  **All Potential Bidders should carefully read the Bidding Procedures Order** which is available free of charge at [Website] or by contacting counsel for the Debtor as follows: Susan K. Seflin, of Ezra Brutzkus Gubner LLP via e-mail at sseflin@ebg-law.com or via facsimile at 818-827-9099. To the extent that there are any inconsistencies between this Notice and the Bidding Procedures Order, the latter shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that if the Debtor receives at least one Qualified Bid within the requirements and time frame specified by the Bidding Procedures, the Debtor will conduct an auction ("**Auction**") of the Debtor's Acquired Assets on **December ___ 2015, commencing at 10:00 a.m. (prevailing Pacific time)** at the offices of Ezra Brutzkus Gubner LLP, 21650 Oxnard Street, Suite 500, Woodland Hills, CA  91367 (or at any such other location or time as the Debtor may hereafter designate in writing to the Qualified Bidders).

**PLEASE TAKE FURTHER NOTICE** that, whether or not an Auction is held, the Debtor will seek approval of its sale of the Acquired Assets at a hearing scheduled to commence on **December ___, 2015 (prevailing Pacific time)** (the "**Sale Hearing**") before The Honorable _____, United States

1

Exh 3_001

Bankruptcy Court Judge, at the U.S. Bankruptcy Court for the Central District of California, San Fernando Valley Division, in Courtroom ___, located at 21041 Burbank Boulevard, Los Angeles, California 91367. The Bidding Procedures Motion also contains the Debtor's request for approval of the sale of the Acquired Assets on the terms therein specified (the "**Sale Motion**").  As noted above, a copy of the Sale Motion is available free of charge at [Website] or by contacting counsel for the Debtor as follows: Susan K. Seflin, of Ezra Brutzkus Gubner LLP via e-mail at sseflin@ebg-law.com or via facsimile at 818-827-9099.

       **PLEASE TAKE FURTHER NOTICE** to implement the sale transactions within the expedited time frame required by the Debtor's circumstances, the Motion requests the **waiver of any stay arising under Bankruptcy Rules 6004(h) and 6006(d), or any similar rules**.  If granted, this **would allow the parties to close on the sale of the Acquired Assets immediately** after the order approving Sale Motion (the "**Sale Order**") is entered on the Court's docket, and **before the Sale Order is a "final" order**. Therefore any party objecting to the Sale Order must exercise diligence in filing an appeal and pursuing a stay of the closing of the transactions or risk any appeal of the Sale Order being foreclosed as moot.

       **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Sale Motion in respect of the Sale, including objections to the assumption and assignment of contracts and leases and/or any proposed cure amounts related thereto, **must**:  (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules; (iii) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (iv) be filed with the Bankruptcy Court no later than **December ___, 2015** (the "**Sale Objection Deadline**").

<u>**CONSEQUENCES OF FAILING TO TIMELY FILE AN OBJECTION**</u>

**ANY PARTY WHO FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED CONTRACTS TO THE SUCCESSFUL BIDDER AND ANY CURE AMOUNTS RELATED THERETO.**

<u>**NO SUCCESSOR OR TRANSFEREE LIABILITY**</u>

The proposed Sale Order may provide that the Purchaser will have no responsibility for, and the assets will be sold free and clear of, any successor liability, including the following, unless otherwise specified in the asset purchase agreement:  (a) any liability or other obligation of the Debtor or related to the Acquired Assets or (b) any Claims against the Debtor or any of its predecessors or affiliates.  The purchaser ("**Purchase**") shall have no liability whatsoever with respect to the Debtor's (or any of its predecessors' or affiliates') respective businesses or operations or any of the Debtor's (or any of its predecessors' or affiliates') obligations ("**Successor or Transferee Liability**") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing.  Except to the extent expressly included in the Assumed Liabilities with respect to Purchaser, the Purchaser shall have no liability or obligation under or any foreign, federal, state, local, labor, employment, or environmental law by virtue of Purchaser's purchase of the Acquired Assets or assumption of the Assumed Liabilities.

Dated: December ___, 2015

                                               EZRA BRUTZKUS GUBNER LLP

                                               By:  DRAFT_____
                                                  Susan K. Seflin
                                                  Proposed Attorneys for Chapter 11
                                                Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>DIGITALSOUND PRODUCTION SERVICES, INC.,<br><br>Debtor. | Case No. _____<br>Chapter 11<br><br>**NOTICE TO COUNTERPARTIES TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**<br><br>[LBR 9075-1; 11 U.S.C. §§ 105(a) 363, 365, 503 and 507; FRBP 2002, 6004, 6006, 9008, and 9014]<br><br><u>Hearing:</u><br>Date:     December __, 2015<br>Time:     __:00 _.m.<br>Place:    Courtroom ___<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA 91367 |

**NOTICE TO COUNTERPARTIES TO POTENTIALLY**
**<u>ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU**
**OR ONE OF YOUR AFFILIATES MAY BE A COUNTERPARTY**
**TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH THE DEBTOR AS**
**SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.[1]**

      **PLEASE TAKE NOTICE** that on November 30, 2015, DigitalSound Production Services, Inc., the chapter 11 debtor and debtor in possession (the "**Debtor**"), filed its *Debtor's Notice of and Emergency Motion for (I) An Order (A) Approving Bidding Procedures in Connection with Sale of the Debtor's Assets, (B) Scheduling Hearing to Consider the Sale, and (C) Approving Form and Manner of Notice Thereof; and (II) an Order Authorizing and Approving (A) the Sale of Substantially All of the Debtor's Assets and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases; Memorandum of Points And Authorities* [Doc. # _____] (the "**Bidding Procedures Motion**") with the above-captioned U.S. Bankruptcy Court for the Central District of California, San Fernando Valley Division ("**Bankruptcy Court**") seeking entry of an order, among other things, (a) authorizing and approving bidding and auction procedures in connection with the sale of substantially all of the Debtor's assets, (b) approving certain bid protections in connection with such sale, (c) approving the form and manner of notice of the sale by auction and sale hearing, (d) approving procedures for the assumption and assignment of executory contracts and unexpired leases and noticing of related cure amounts and (e) scheduling the sale hearing and setting *other* related dates and deadlines, all as further described in the Bidding Procedures Motion.  Please note that all capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures Motion.

      **PLEASE TAKE FURTHER NOTICE** that the Debtor has entered into a sale agreement ("**APA**") with **Atomic Lighting LLC** ("**Stalking Horse Purchaser**"), and is soliciting overbid offers for the purchase of the Debtor's assets consistent with the bidding procedures ("**Bidding Procedures**") approved by the Bankruptcy Court pursuant to its order entered on December ___, 2015 [Doc. #___]

---

[1] This notice is being sent to counterparties to Contracts and Leases.  This Notice is <u>not</u> an admission by the Debtor that such contract is executory or such lease is unexpired.

1

**Exh 4_001**

("**Bidding Procedures Order**").  The Bidding Procedures are set forth in the Bidding Procedures Order. **All interested bidders should carefully read the Bidding Procedures Order** which is available free of charge at [Website] or by contacting counsel for the Debtor as follows: Susan K. Seflin, of Ezra Brutzkus Gubner LLP via e-mail at sseflin@ebg-law.com or via facsimile at 818-827-9099. To the extent that there are any inconsistencies between this Notice and the Bidding Procedures, the latter shall govern in all respects.

        PLEASE TAKE FURTHER NOTICE that, pursuant to the Bidding Procedures Order, the Debtor **may** assume and assign to any Successful Bidder either on the date of the closing of the Sale (the "**Closing Date**"), or such later date as may be provided in the Sale Order, the Assigned Contracts listed on **Exhibit A** attached hereto to which you may be a counterparty.  The Debtor has conducted a review of its books and records and has determined that the cure amount for unpaid monetary obligations under such Assumed Contract is as set forth on **Exhibit A** attached hereto (the "**Cure Amount**").

## OBJECTIONS TO CURE AMOUNT AND ADEQUATE ASSURANCE

        PLEASE TAKE FURTHER NOTICE that, if you disagree with the proposed Cure Amount, object to the proposed assignment to the Successful Bidder(s) of your executory contract or unexpired lease, or object to any Successful Bidder's ability to provide adequate assurance of future performance with respect to any Assumed Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, the alleged correct cure amount, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Bankruptcy Court by no later than **December __, 2015 at __p.m. (prevailing Pacific time)**.

        PLEASE TAKE FURTHER NOTICE that further adequate assurance information for the Stalking Horse Purchaser or Successful Bidders is available from Debtor's counsel as follows:

**EZRA BRUTZKUS GUBNER LLP**
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:      (818) 827-9000
Facsimile:       (818) 827-9099
Susan K. Seflin (email: sseflin@ebg-law.com)
Jerrold L. Bregman (email:  jbregman@ebg-law.com)

        **PLEASE TAKE FURTHER NOTICE that any party who fails to timely file an objection to its scheduled Cure Amount listed on the Cure Notice or to the assumption and assignment of any Assumed Contract (a) shall be forever barred from objecting thereto, including (i) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults and (ii) asserting that the Stalking Horse Purchaser or other Successful Bidder (if not the Stalking Horse Purchaser is not the Successful Bidder) has not provided adequate assurance of future performance as of the date of the Sale Order and (b) shall be deemed to consent to the Sale and to the assumption and assignment to the Stalking Horse Purchaser or other Successful Bidder (if not the Stalking Horse Purchaser is not the Successful Bidder).**

        Any objection to the proposed assumption and assignment of an Assumed Contract or related Cure Amount in connection with the Sale that remains unresolved as of the Sale Hearing

2

**Exh 4_002**

shall be heard at the Sale Hearing (or at a later date as fixed by the Bankruptcy Court); provided, however, that with respect to any Assumed Contract to which such objection pertains solely to the Cure Amount proposed with respect thereto, the Debtor may seek at the Sale Hearing to assume such Assumed Contract and assign it to the Stalking Horse Purchaser or other Successful Bidder (if not the Stalking Horse Purchaser is not the Successful Bidder); provided further, however, that the Debtor or the Successful Bidder, as applicable, must segregate funds from the net proceeds of the applicable sale equal to the undisputed portion of the applicable Cure Amount pending the resolution of such dispute by the Bankruptcy Court or by agreement of the parties, and pay any amount owed promptly to the applicable counterparty upon such resolution.

## SALE HEARING

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing is scheduled to take place on **December ___ 2015, at ____.m. (prevailing Pacific time)** (the "**Sale Hearing**") before The Honorable _____, United States Bankruptcy Court Judge, at the U.S. Bankruptcy Court for the Central District of California, San Fernando Valley Division, in Courtroom __, located at 21041 Burbank Boulevard, Los Angeles, California 91367.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any contract or lease on the Cure Notice does not require or guarantee that such contract or lease will be assumed and assigned, and all rights of the Debtor with respect to such Contract or Lease are reserved. Moreover, the Debtor explicitly reserves its rights, in its sole discretion, to seek to reject or assume each Contract or Lease pursuant to Section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing any Successful Bidder(s) to designate Contracts and Leases to be assumed and assigned to such buyer.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Contracts and Leases or the validity, priority or amount of any claims of a counterparty to any Contract or Lease against the Debtor that may arise under such Contract or Lease, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Contract or Lease against the Debtor that may arise under such Contract or Lease.

# # #

[*Continued on next page.*]

3

**Exh 4_003**

## EXHIBIT A TO CURE NOTICE

### Cure Amount(s)

| Counterparty Name | Contract/Lease | Cure Amount |
|---|---|---|
|  |  |  |

Dated: December __, 2015

EZRA BRUTZKUS GUBNER LLP

By:  DRAFT
Susan K. Seflin
Proposed Attorneys for Chapter 11
Debtor and Debtor in Possession

1449462

**Exh 4_004**